UNITED STATES of America,

v.

John A. GOTTI, Dominick Loiacono, Vincent Zollo, Anthony Plomitallo, Michael Zambouros, and Dennis McClain, Defendants.

No. 98 CR 42(BDP).

United States District Court, S.D. New York.

March 16, 1999.

Andrew McCarthy, A.U.S.A., ·Carol Sipperly, A.U.S.A., Marjorie Miller, A.U.S.A., U.S. Attorney's Office, White Plains, NY, for U.S.A.

Gerald Shargell, Sarita Kedia, New York City, Bruce Cutler, New York City, for defendant John A. Gotti, Jr.

Barry M. Fallick, Rochman Platzer Fallick & Sternheim, New York City, for defendant Dominick Loiacono.

Robert P. Leighton, Leighton, Leighton & Leighton, New York City, for defendant Vincent Zollo.

Richard A. Rehbock, Jericho, NY, for defendant Anthony Plomitallo.

Barry E. Schulman, Brooklyn, NY, for defendant Michael Zambouros.

Dominick Porco, Scarsdale, NY, for defendant Dennis McClain.

## OPINION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Currently before this Court are the omnibus pretrial motions of defendants John A. Gotti, Dominick Loiacono, Vincent Zollo, Anthony Plomitallo, Michael Zambouros, and Dennis McClain who are charged in various counts of the Indictment with, *inter alia*, racketeering, conspiracy, extortion, wire fraud, extortion in telecommunications and gambling.

In these motions which, in large part, challenge various aspects of the investigations that culminated in the indictments, the defendants seek to suppress evidence allegedly obtained as the result of illegal electronic surveillance, invalid warrants, and unconstitutional searches. In addition, defendants challenge the sufficiency of the Indictment in a number of respects and seek discovery beyond what has already been provided by the Government. What follows is this Court's resolution of the motions.

## I. *SUPPRESSION OF WIRETAP EVIDENCE BASED ON LACK OF PROBABLE CAUSE*[1]

 Defendant John A. Gotti seeks suppression of the fruits of electronic surveillance conducted at various times in 1994, 1995, 1996, and 1997 by state law enforcement officials acting pursuant to

---

1. Normally the admissibility of evidence in a federal criminal prosecution is governed by federal law. *See, e.g., Preston v. United States,* 376 U.S. 364, 366, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *see United States v. Sotomayor,* 592 F.2d 1219, 1223–24 (2d Cir.) (collecting cases), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). While in *United States v. Sotomayor,* 592 F.2d at 1225, our Circuit noted in dicta that a state's more stringent statutory requirements might be applied in a federal prosecution if those requirements were more substantive than procedural, this language has never been used to bar the admission of wiretap evidence. *United States v. Miller,* 116 F.3d 641, 661 (2d Cir. 1997); *United States v. Rowell,* 903 F.2d 899, 902 (2d Cir.1990) (applying federal standard for probable cause to motion to suppress evidence obtained under state-issued wiretap warrant despite existence of stricter state standard for admissibility). Thus, this Court will evaluate the admissibility of the wiretap evidence in accordance with the federal standards.

authorizations from New York courts. Specifically, Gotti challenges electronic interceptions of conversations (1) over a telephone at City Auto Salvage ("City Auto"), (2) over his home and office telephones, (3) over co-defendant Anthony Plomitallo's home telephone, (4) within vehicles operated by Plomitallo and Anthony Amoroso, and (5) in Gotti's office at 97–11 Sutphin Boulevard, Queens, New York. Gotti contends that suppression of the fruits of these interceptions is warranted because the applications submitted to obtain the authorizations contained insufficient aver-

ments of probable cause and insufficient showings that the premises were used for criminal activities. Co-defendant Plomitallo joins Gotti's motion with respect to his and Gotti's home telephone numbers, and the telephone at the Sutphin Boulevard location. Plomitallo's standing to join in Gotti's challenge is not contested by the Government.

The following are the various eavesdropping authorizations which Gotti contends were issued without probable cause: [2]

| DATE | AUTHORIZED BY | SUBJECT OF AUTHORIZATION | SUPPORTING AFFIDAVIT |
|---|---|---|---|
| December 20, 1995 | Honorable Sondra Miller, Appellate Division, Second Department | Authorization of interception of telephone conversations at City Auto Salvage relating to gambling | Special Investigator Pasquale Perrotta |
| January 18, 1996 | Justice Miller | Extension and amendment to include interception of conversations relating to criminal usury, coercion, grand larceny by extortion and conspiracy | Special Investigator Ercole Gaudioso |
| February 15, 1996 | Justice Miller | Extension | Special Investigator Gaudioso |
| March 14, 1996 | Justice Miller | Extension | Special Investigator Gaudioso |
| April 25, 1996 | Justice Miller | Amendment to authorize interception of conversations over Plomitallo's home telephone and within a 1987 Mercury | Special Investigator Gaudioso |

**2.** In addition to claiming the warrants lacked probable cause, Gotti also contests a Supplemental Affidavit filed with Justice Miller on January 24, 1996, by Assistant District Attorney Vincent G. Heintz (also a Former Special Assistant United States Attorney), stating that the prior applications (December 20, 1995 and January 18, 1996) failed to disclose prior eavesdropping of defendant Gotti and Michael McLaughlin, an alleged associate of Gotti. Heintz requested that this disclosure be received by the court *nunc pro tunc* as compliance with CPL 700.20. Gotti claims there was no indication of a judicial response to this request.

| DATE | AUTHORIZED BY | SUBJECT OF AUTHORIZATION | SUPPORTING AFFIDAVIT |
|---|---|---|---|
| May 10, 1996 | Justice Miller | Extension and amendment to discontinue interception within 1987 Mercury | Special Investigator Gaudioso |
| May 17, 1996 | Justice Miller | Amendment to authorize interception within 1987 Mercury | Special Investigator Gaudioso |
| June 6, 1996 | Justice Miller | Extension and amendment to authorize interception of conversations over Gotti's home telephone and within a 1996 Jeep | Special Investigator Gaudioso |
| June 26, 1996 | Justice Miller | Amendment to authorize interception of telephone at Sutphin Boulevard | Special Investigator Gaudioso |
| July 3, 1996 | Justice Miller | Extension and amendment to authorize interception of telephone at Sutphin Boulevard | Special Investigator Gaudioso |

## DISCUSSION

18 U.S.C. § 2518 sets out the procedures governing the authorization of wire-taps. Section 2518(3) requires a judicial determination that: (1) there is probable cause to believe that a particular type of crime has been, is being, or is about to be committed, (2) there is probable cause to believe that particular communications concerning the crime will be obtained through the wiretapping, (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or unfeasible, and (4) there is probable cause to believe that the phones to be tapped are being used for criminal purposes or by the target of the wiretap. 18 U.S.C. § 2518(3); *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir.1993); *United States v. Ambrosio*, 898 F.Supp. 177, 180 (S.D.N.Y.1995).

█ Probable cause to authorize a wire-tap "is established if the 'totality of the circumstances' contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance."[3] *Ambrosio*, 898

---

3. The test for probable cause under 18 U.S.C. § 2518 essentially parallels the test to obtain a search warrant. *Wagner*, 989 F.2d at 71. For our purposes, probable cause "means less than evidence which would justify [a conviction]" and is far more comparable to evidence "which warrant[s][a] suspicion." *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).(citation omitted). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity....'" *Wagner*, 989 F.2d at 72 (citing *Gates*, 462 U.S. at 235, 103 S.Ct. 2317).

F.Supp. at 181. The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is fair probability that ... evidence of a crime will be found." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

■■■■ Orders authorizing the interception of wire communications are entitled to a presumption of validity. Therefore, substantial deference is afforded the issuing judicial officer's determination of probable cause, *Ambrosio,* 898 F.Supp. at 181 (citations omitted), and doubts as to the existence of probable cause must be resolved in favor of the prior judicial authorization. *Gates,* 462 U.S. at 237 n. 10, 103 S.Ct. 2317. Consequently, this Court's review is not *de novo* but is limited to determining whether that judicial officer had a "substantial basis" for her determination. *Wagner,* 989 F.2d at 72 (citing *Gates,* 462 U.S. at 236, 103 S.Ct. 2317). Stated another way, "[u]naided by the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised regarding a requested surveillance; but so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking' ". *United States v. Gigante,* 979 F.Supp. 959, 963 (S.D.N.Y.1997).

In approving the December 20, 1995 warrant application, Justice Miller concluded that the affidavits submitted to her provided probable cause to believe that the telephone at City Auto facilitated communications between Gotti and his subordinates and that the interceptions authorized would generate information concerning specified criminal activity. Based on the December 20, 1995 application, Justice Miller authorized the inter-

ception of gambling related communications of the following type:

> the identities of co-conspirators; locations where gambling occurs and where gambling proceeds and gambling records are safeguarded; methods by which proceeds are secreted and disbursed to the principals of the enterprise; ... conversations relating to the acceptance of policy wagers, the money accepted for, and the records of, those wagers; ... the coordination of meetings to pay and collect monies, and to discuss and further illegal gambling.[4]

Gotti asserts that the affidavits comprising the December 20 application did not establish probable cause because they contained an insufficient showing that the City Auto phone would be used by the targeted individuals, that Gotti was linked to the illegal activity there, or, for that matter, that the phone was ever used to facilitate gambling.

In support of his claim, Gotti invites the Court to follow his lead in evaluating in isolation discrete allegations in the affidavits, and to conclude that deficiencies with various specific allegations mean that the affidavits, taken as a whole, do not establish probable cause. This approach, however, is flawed, since it is well-established that the allegations contained in a wiretap affidavit should be read in their entirety and in a common-sense manner with each fact gaining color from the others. *United States v. Ruggiero,* 824 F.Supp. 379, 399 (S.D.N.Y.1993), *aff'd sub nom., United States v. Aulicino,* 44 F.3d 1102 (2d Cir. 1995) (citing *United States v. Monica,* 295 F.2d 400, 401 (2d Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962)). *Ambrosio,* 898 F.Supp. at 181; *see United States v. Bellomo,* 954 F.Supp. 630, 638 (S.D.N.Y.1997) ("While the intercepted conversations, considered separately, may not be dispositive of guilt on the particular issues, that is not the relevant standard.").

---

4. The warrant also authorized interception for all communications which "may be cryp-

tic, guarded or coded to disguise their true meanings."

With these principles in mind, the Court now reviews the applications in question. They detail the results of years of investigation yielding information concerning the alleged Gambino Crime Family, its existence, its activities, its members and its methods of operation. Were this extensive background information ignored by Justice Miller, probable cause for the interceptions in question quite possibly would not exist. This background information, however, cannot be discounted since it provides a necessary and quite proper context for understanding activities and conversations that by themselves might be innocent or innocuous. Once these principles are applied, the Court concludes that probable cause for the challenged interceptions was documented, although the issue is not free from difficulty.

The Perrotta Affidavit submitted in support of the December 20, 1995 application was divided into six parts. Part I described the structure of the alleged Gambino Family and explained the general rule that subordinates must receive permission from their superiors to engage in criminality and are required to share proceeds with their superiors. Part II identified the targets of the investigation, and specified that Craig DePalma (a former defendant in this case) was a soldier in the crew headed by "capo" Gotti. Part III outlined the evidence of illegal gambling collected to date establishing that evidence of meetings involving the group's leaders and members would show the existence of the gambling conspiracy. Part IV outlined the evidence of loansharking. Part V outlined the targets' use of labor organizations to commit extortion. Part VI outlined the evidence of the conspirators' membership in the Gambino Family, their subordinate status to Gotti, their pattern of meeting with him and their use of phones to coordinate illegal activities. Part VI also identified the Bergin Hunt and Fish Club ("Bergin Club") as a social club that was a traditional meeting place for members of the Gambino organization.

The application also incorporated three previous warrants which had been issued by: (1) Acting State Supreme Court Justice Joseph K. West on August 12, 1994, and extended through June 10, 1995, (2) the Honorable Joseph P. Sullivan of the Appellate Division, First Department, on September 27, 1994, and extended through December 22, 1994, and (3) Justice West on June 6, 1995, and extended through December 20, 1995.

In discussing the telephone at City Auto, the Perrotta Affidavit established that Gotti's home telephone was used on 32 occasions between August 28, 1995 and October 25, 1995 to contact City Auto. The pager of former co-defendant Craig DePalma received at least 17 pages between September 22, 1995 and December 18, 1995 from the telephone at City Auto. The Affidavit further stated that eavesdropping over DePalma's cellular phone indicated that these calls between the instruments consisted of cryptic discussions with unnamed other persons regarding meetings at future, unspecified times. This section also included an example of City Auto's owner Michael McLaughlin (identified in the Affidavit as a close associate of Gotti) using the telephone to transfer a message from Gotti to DePalma. For example, McLaughlin informed DePalma that "he" wanted McLaughlin to ask DePalma to obtain five tickets to a show "for his sister," indicating that the tickets were needed for "the three boys, Carmine and her." Gotti's sister is married to Carmine Agnello. The section of the Affidavit concerning the telephone at City Auto also averred that the phone was used by DePalma and others to coordinate and discuss meetings with Gotti.

Interceptions such as these establishing the structure, membership and functioning of an illicit enterprise were properly a potential target of interceptions as a source of evidence of particular forms of racketeering such as gambling. Contrary to Gotti's submission, Justice Miller was not invited to consider in isolation the na-

ture, content and frequency of the communications adverted to in these affidavits, but rather to consider them in the context of averments that they showed the operation of an organized criminal operation.

The Gaudioso Affidavit submitted in support of the January 18, 1996 extension and amendment starts by describing how the existence, structure and *modus operandi* of the alleged Gambino Family are related to the criminal operations under investigation. The Affidavit then outlines several phone calls intercepted over City Auto's telephone line, and indicates that interception has provided evidence of assistance provided by McLaughlin to Gotti. The Affidavit also stated that prior interceptions had revealed that Gotti used the phone himself to discuss affairs and schedule meetings with subordinates. Gaudioso submitted several examples of intercepted calls. One such call, on December 23, 1995, involved an unidentified male, identified only as Charlie, who called City Auto asking to speak to Michael McLaughlin. An employee, Vinny Spirito, had answered the phone and stated that Mike was not in. Charlie reported that one of "John's" gifts had been left at the restaurant. Charlie directed Spirito, "So send one of the guys you don't think is going to drop it. I don't know what the fuck it is, but I ain't taking no chances." Gaudioso concluded that, based on his familiarity with the methods and traditions of *La Cosa Nostra*, the conversation referred to a tribute payment.

On December 23, 1995, an unidentified male caller dialed City Auto and explained that he was looking for "John." The unidentified male speaker who answered the call indicated that McLaughlin was not at the location, and that he himself could not connect the caller to "John." Gaudioso concluded, and represented to Justice Miller, that this call indicated McLaughlin's role in contacting Gotti since an individual who wanted to speak to Gotti, in the first instance, had to ask permission of McLaughlin. On December 23, 1995, Craig DePalma called City Auto and in a

terse discussion with McLaughlin asked McLaughlin, "You got it?" McLaughlin responded, "Yeah, it's right on my desk. I'm going to bring it over to him a little later." DePalma thankfully replied, "I knew I could rely on you." On December 26, 1995, a male speaker identified only as Joseph dialed City Auto and asked McLaughlin whether "John" would be available for dinner in order "to speak about a few things." Joseph mentioned that Gotti "is usually around on Wednesday night." McLaughlin responded, "That's right, it's Tuesday already." Gotti then got on the phone, explained that he was going to Boston and agreed to meet with Joseph after his return.

Justice Miller's January 18 amendment and extension authorized the Government to intercept conversations relating to gambling that included:

> the identities and relationships of co-conspirators, including conversations establishing the relationship between individuals committing the gambling offenses and those associated with the Gambino crime family, which is controlling the gambling operation; ... the coordination of meetings to pay and collect monies, and to discuss and further illegal gambling, and communications setting up and coordinating meetings between the various members of the criminal conspiracy and the criminal syndicate controlling this gambling activity, and communications establishing the existence of the criminal syndicate; ....

The Affidavit submitted in support of the February 15, 1996 extension and amendment demonstrated that electronic surveillance had produced evidence of the ongoing operation of the Gambino Family and criminal activity occurring as a consequence of the DePalmas' membership in the Gambino Family. The Affidavit also recounts Craig DePalma's use of the phone at City Auto to arrange an appointment with his brother and an individual named "Rich" at a Manhattan law office, Peter Gotti's call to City Auto looking for Gotti,

and eavesdropping that led to physical surveillance of Gotti and Craig DePalma at the Bergin Club. Gaudioso also submitted an Affidavit in support of the March 14 extension outlining several conversations intercepted over the City Auto telephone line which described, *inter alia*, McLaughlin's use of the phone to set up a meeting for Gotti with an "Iggy" at the Bergin Club and Gotti's call into City Auto requesting Craig DePalma's pager number.

Justice Miller, on April 25, 1996, amended the warrant application to authorize interception of defendant Plomitallo's home telephone and within his 1987 Mercury. The Heintz Affidavit submitted in support of the application described Plomitallo as a close associate of Gotti who transports Gotti to meetings in his 1987 Mercury and has personal knowledge of Gotti's role in the criminal operations under investigation. Heintz also averred that Plomitallo ordered an unnamed debtor to tender payments to Gotti—averments indicative of loan sharking activities. Gaudioso's Affidavit identified pen register, eavesdropping, and physical evidence establishing Plomitallo's relationship with Gotti. Generally, the Gaudioso Affidavit shows that Plomitallo and Gotti contacted one another by Plomitallo's home phone and Plomitallo's pager, that Plomitallo used his home phone to contact McLaughlin, the Bergin Club and 97–11 Sutphin Boulevard, and Gotti called Plomitallo to have him arrange transportation.

On May 10, 1996, Justice Miller authorized an extension of the interception of calls on Plomitallo's home phone and discontinued authorization to intercept communications within the Mercury. Gaudioso's Affidavit in support of the extension also discussed a call from the Bergin Club to Plomitallo's residence, directing Plomitallo to "pick him up five to twelve" and a later conversation that indicated that this person was John Gotti. On May 17, 1996 Justice Miller reauthorized the installation of a listening device in the 1987 Mercury and extended the interception of Plomital-lo's home telephone. Gaudioso's Affidavit included observations of Plomitallo's car outside of the Bergin Club, and Plomitallo at dinner in a back room at a restaurant in Maspeth, New York with Gotti, Craig DePalma, William Marshall, Michael McLaughlin and others.

On June 6, 1996, Justice Miller extended the warrant for eavesdropping over Plomitallo's home telephone and the Mercury, and amended the warrant, *inter alia*, to permit interception over Gotti's home telephone and a 1996 Jeep driven by Anthony Amoroso. Gaudioso's Affidavit alleged that Gotti relied upon his home telephone to contact various members of his organization to arrange transportation to meetings with co-conspirators. The Affidavit outlined routine contact between the Gotti residence and the Bergin Club, the storefront at 97–11 Sutphin Boulevard, where Gotti and Plomitallo stored a parcel that was likely currency, City Auto, Steven Kaplan, one of Gotti's drivers who also participated in various meetings, McLaughlin, and Plomitallo. The Affidavit used these facts to conclude that the Gotti residence telephone was fully integrated into the network of telephones, pagers, cellular phones and pagers which Gotti used to arrange the meetings with co-conspirators necessary to his direction and control over the Gambino Family, the organization believed to be responsible for the crimes under investigation.

In support of the interception of oral communications within the 1996 Jeep, the Gaudioso Affidavit indicated that Amoroso was a trusted driver of Gotti who attended and participated in meetings between Gotti and co-conspirators, and that the 1996 Jeep served as a routine mode of transportation for Gotti. Gaudioso also detailed several conversations between and among Amoroso, Plomitallo, McLaughlin and Gotti concerning transporting Gotti to various places. The Affidavit also detailed a planned trip to Florida in May 1996 by Gotti, Amoroso, and Plomitallo and Gotti's subsequent withdrawal from the trip,

which, Gaudioso posited, showed the trust Gotti had in both Amoroso and Plomitallo to travel to Florida to further his business affairs.

Surveillance also indicated Amoroso was present at the Bergin Club at times when Gotti·was there and attended gatherings at restaurants that included Gotti and others. On two occasions identified in the Affidavit, parcels were placed into Amoroso's car following gatherings with others; after one of these occasions, Gotti departed with Amoroso in Amoroso's Jeep.

On June 26, 1996, Justice Miller amended the warrant to include interceptions over the telephone at the storefront at 97–11 Sutphin Boulevard, and on July 3, 1996, extended and amended the warrant to include interceptions within 97–11 Sutphin Boulevard. Gaudioso's Affidavit in support of the June 26 application also indicated that the phone at 97–11 Sutphin Boulevard had been used to contact: (1) the home of Gotti on 22 occasions between May 8 and June 14, 1996, (2) the Bergin Club, (3) JAG Brokerage, one of Gotti's businesses, (4) McLaughlin's home telephone, (5) Plomitallo's home telephone, (6) the cellular phone of Amoroso, and (7) Craig DePalma's pager. The Affidavit indicated that 137 calls had been placed from the phone at 97–11 Sutphin Boulevard to City Auto from May 3 to June 14, 1996, and six calls had been placed to three companies allegedly involved in separate construction and labor official bribery schemes. The Affidavit detailed meetings inside the building with the front gate down obscuring the storefront from public view, and a parcel being deposited at the store on October 12, 1995. The Affidavit further noted that eavesdropping over Gotti's home residence's telephone confirmed Gotti's routine presence at 97–11 Sutphin Boulevard as a consequence of frequent phone calls there from his wife.

■ A review of the evidence proffered in support of the warrants and the various amendments and extensions of the initial December 20, 1995 application establishes that probable cause was documented and that Justice Miller was provided a basis to believe that evidence of criminal activity would be intercepted.

Viewed discretely, many of these allegations might appear innocuous or to be insufficient predicates for probable cause. But Justice Miller was not obligated to review them in that manner. The affidavits submitted to her established probable cause to believe in the existence of the Gambino Family, to believe that it engaged in the criminal activities under investigation and to believe that Gotti had a leadership position. Viewing this constellation of evidence in the practical, common sense fashion the law requires, there was justification for her to conclude that seemingly innocuous conversations and disconnected activities reflected on-going organized criminal activity.

■ Gotti also contends that evidence supplied in support of the various applications was stale. The principal factors in assessing whether supporting facts have become stale are not only their age, but also the nature of the conduct alleged to have violated the law. *See United States v. Gallo,* 863 F.2d 185, 192 (2d Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989) (citation omitted). Where, as here, the supporting affidavits present " 'a picture of continuing conduct,' as opposed to an isolated instance of wrongdoing ... 'the passage of time between the last described act and the presentation of the application becomes less significant.' " *Id.* at 191 (citation omitted); *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991). Further, seemingly stale allegations can be revitalized by additional allegations containing current information indicating continuity of the alleged unusual activities. *See United States v. Perry,* 643 F.2d 38, 50 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *see also Gallo,* 863 F.2d at 192. As previously noted, the affidavits presented to Justice Miller described an on-going crimi-

nal enterprise and satisfactorily documented the necessary continuity.

The December 20, 1995 warrant authorized the interception of conversations concerning gambling on the City Auto telephone. Gotti contends that no amendment was sought by the Government to seek authorization to intercept conversations pertaining to the additional crimes of usury, coercion and grand larceny, and that the January 18, 1996 extension and amendment application assumes such authorization has already been given. But these additional crimes were already within the scope of electronic surveillance of other phones and a listening device that were encompassed in the December 20, 1995 warrant. Thus, the Government correctly contended that the January warrant application, by its terms, was an extension and an amendment and that facts contained in the papers incorporated in that application supported a finding of probable cause to extend the interception at City Auto to include the other crimes.

■ Gotti also notes that there is no judicial response to the Government's late disclosure of prior eavesdropping of Gotti and McLaughlin in its December 20, 1995 and January 18, 1996 warrant applications. On January 24, 1996 Heintz disclosed this information to Justice Miller through a Supplemental Affidavit. This Supplemental Affidavit was stamped as received, and Justice Miller ultimately ratified and accepted the Government's good faith effort to comply with the statute by allowing the warrant to remain in force, and indeed, extended it on February 15, 1996. In any event, it is highly unlikely that had this disclosure been made earlier it would have vitiated the Government's showing of probable cause, and thus this objection does not supply a basis for suppression. *See United States v. Massino,* 657 F.Supp. 101, 106–107 (S.D.N.Y.1987) (inadvertent failure to disclose previous eavesdropping does not require suppression of interceptions where non-disclosure did not affect probable cause).

■ Moreover, even assuming that the extensive affidavits somehow did not establish probable cause, law enforcement officers relied in good faith on the warrants. Under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), evidence seized pursuant to a warrant which is later found not to have been grounded on probable cause will not be suppressed if the agents enforcing the warrant relied in good faith on the warrant. While *Leon* does not directly address electronic surveillance, other Circuits as well as Courts within this District have, for reasons this Court finds persuasive, extended its exception to wiretaps. *See United States v. Moore,* 41 F.3d 370, 376 (8th Cir.1994) (applying *Leon* to wiretap evidence because of legislative history), *cert. denied,* 514 U.S. 1121, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995); *United States v. Malekzadeh,* 855 F.2d 1492, 1497 (11th Cir. 1988), *cert. denied,* 489 U.S. 1024, 109 S.Ct. 1149, 103 L.Ed.2d 209 (1989); *United States v. Gangi,* 97 cr 1215, 1999 WL 55821, at *4, (S.D.N.Y. Jan.27, 1999); *Bellomo,* 954 F.Supp. at 638 (even if court found no probable cause for wiretap order, wiretap evidence would not be suppressed where agents acted in good faith reliance); *Ambrosio,* 898 F.Supp. 177, 186–89 (S.D.N.Y.1995) (applying good faith exception to wiretaps); *but see United States v. Orena,* 883 F.Supp. 849, 860 n. 7 (E.D.N.Y. 1995) (noting conflict among courts); *United States v. McGuinness,* 764 F.Supp. 888, 897 n. 2 (S.D.N.Y.1991).

Gotti argues that *Leon* does not apply since the warrant applications were so lacking in indicia of probable cause that reliance upon them was unreasonable. As previously noted, however, the Government's submissions establish that the warrants, on their faces, were not manifestly deficient, that the agents who procured them did not act in a reckless or dishonest fashion and that the agents' reliance on them, was reasonable. The motion to suppress based on a lack of probable cause is denied.

## II. MINIMIZATION OF ELECTRONIC SURVEILLANCE AND AMENDMENT TO INCLUDE CONVERSATIONS PERTAINING TO TELECOMMUNICATIONS

Zambouros and Gotti also contend that the Government failed to minimize the interception of communications that did not involve the criminal activity that was the subject of the warrants or to seek an amendment to reach interception of conversations concerning Gotti's telecommunications business. Zambouros seeks suppression based on these allegations. Gotti's contention is entirely based on an intercepted conversation in Plomitallo's car relating to Gotti's involvement in starting the telecommunications business that is the subject of the Indictment.

■■■ Turning first to Zambouros, he was intercepted, not on his line, but on the telephone lines of Gotti and Plomitallo, in the interior of Gotti and Plomitallo's office and in Plomitallo's car. Consequently, he lacks standing to make this minimization challenge. See United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir.1991) (Movants had no expectation of privacy in someone else's home and telephone that would provide a basis for them to seek suppression of evidence; 18 U.S.C. § 2518(10)(a)(i) and (iii) which provides that "[a]ny aggrieved person" may move to suppress wiretap evidence when "the communication was unlawfully intercepted" or "the interception was not made in conformity with the order of authorization," is to be construed in accordance with standing requirements usually applied to suppression claims under the Fourth Amendment.); United States v. Gallo, 863 F.2d 185, 192 (2d Cir.1988).

■■■ When Government agents intercept communications pursuant to Title III, "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." Scott v. United States, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The Government bears the initial burden of establishing that minimization requirements have been met. See United States v. Cirillo, 499 F.2d 872, 880–81 (2d Cir.), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); United States v. Manfredi, 488 F.2d 588, 599–600 (2d Cir.1973).

■■■ The determination as to whether minimization should have occurred requires an assessment of the reasonableness of the interceptions in light of the purpose of the wiretap and the totality of the circumstances. United States v. Napolitano, 552 F.Supp. 465, 476 (S.D.N.Y.1982) (citing Scott, 436 U.S. at 131, 139–140, 98 S.Ct. 1717). Minimization may be more difficult, and more extensive surveillance may therefore be permitted, if the investigation focuses on a widespread conspiracy. See Scott, 436 U.S. at 140, 98 S.Ct. 1717; Napolitano, 552 F.Supp. at 476. Also, the interception of a large number of non-pertinent telephone calls when the conversations are short, coded or ambiguous in nature does not necessarily mean minimization requirements were not met. Scott, 436 U.S. at 140, 98 S.Ct. 1717 ("the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable").

■■■ Courts have identified several measures which, if taken by the Government, support a finding of compliance with § 2518(5). These include: 1) maintenance of monitoring logs, 2) judicial supervision of the progress of the surveillance, 3) supervision by the prosecutor, and 4) requiring all monitoring personnel to read the minimization instructions, court orders and applications, and the posting of these documents at the monitoring location. United States v. Santoro, 647 F.Supp. 153, 161 (E.D.N.Y.1986) (citations omitted), aff'd, 880 F.2d 1319 (2d Cir.1989).

■■■ Here, the Government has demonstrated, on the strength of the Heintz Affi-

davit of January 7, 1999, that it adhered to minimization requirements. The Government maintained surveillance logs that were prepared contemporaneously with the interception of calls. Progress reports were submitted to the issuing court, monitoring officers were briefed prior to the commencement of a newly-issued warrant on the minimization requirements, and written memoranda were posted at the eavesdropping facilities that explained the standards for minimization and the procedures to be followed for compliance.

The procedures followed by the Government in this investigation constituted a reasonable, good faith attempt to minimize the interception of non-pertinent communications and complied with applicable minimization requirements. *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Santoro*, 647 F.Supp. at 160. Because Zambouros, assuming he had standing, has failed to demonstrate that a substantial number of nonpertinent conversations were unreasonably intercepted, suppression, or in the alternative a hearing, is not required. *See United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).

Zambouros and Gotti also contend that no amendment to Justice Miller's authorization was sought or obtained to extend to communications concerning telecommunications fraud.[5] This contention is not supported by the record. Title III dictates that an eavesdropping warrant specify the crimes to be evidenced through the conversations to be monitored. *See* 18 U.S.C. § 2518(4)(c). The Title also provides that the contents of communications which constitute evidence of crimes not specified in the eavesdropping warrant under which

interception was effected may not be used as evidence of such crimes in another proceeding, unless the use of such communications is "authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter." 18 U.S.C. § 2517(5).

On October 14, 1997, Justice Miller issued an order pursuant to § 2517(5) permitting the disclosure of intercepted communications as evidence of certain federal offenses, including access device fraud. The order was based upon, and incorporated, the application by Heintz, which discussed the interception of the communications constituting access device fraud. The Heintz application stated:

> In addition to generating evidence of the state and federal crimes enumerated above, the execution of the incorporated Warrants also produced substantial evidence of a scheme perpetuated by John A. Gotti and others to defraud telecommunications carriers and consumers, in violation of 18 U.S.C. § 1029 (Access Device Fraud). The incorporated Warrants did not name this offense or any analogous state crime. The interception of communications related to this scheme, however, was a consequence of the exercise of authority to intercept related types of communications specified in the Warrants. Upon learning of the existence of Nicodan Telecommunications, a prepaid calling card business owned by Gotti and operated from his office at 97–11 Sutphin Boulevard, Queens, New York, OCTF Special Investigator Ercole Gaudioso learned from other law enforcement officers with experience in the investigation of crimes committed through the marketing of

---

5. In a March 10, 1999 letter to this Court, Zambouros' attorney for the first time raises the issue not of the existence of an amendment but of its timeliness. As this new allegation was raised on the eve of trial and well after the defendants' pre-trial motions were due, it will not be addressed. In any event,

the Heintz Affidavit submitted in support of the amendment stated that probable cause did not exist until August 1997 and the amendment was sought in October 1997, which seems reasonable. *See* 18 U.S.C. § 2517(5) (applications are to be made "as soon as practicable").

prepaid calling cards that that industry offers viable opportunities to launder cash proceeds of criminal operations, such as gambling and loansharking, forms of racketeering within the scope of this Warrant. Because the incorporated Warrants authorized the interception of communications evidencing the generation, secreting and disbursement of revenue obtained through the commission of these crimes, executing officers intercepted conversations pertinent to this scheme to determine if Nicodan's cash revenue was related to the cash-generating forms of racketeering identified in the Warrants.... Finally, it was not until August 1997 that probable cause existed to believe that these communications constituted evidence of a scheme to defraud, our ultimate understanding of the probative value of these communications by the U.S. Secret Service and the tender of business records to OCTF by industry members....

Justice Miller also determined in the October 1997 order that the original orders were applied for in "good faith" and not as a pretext to intercept evidence of unauthorized offenses. Accordingly, a proper amendment was sought and granted by a court of competent jurisdiction. *See In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384, 389 (2d Cir.1989) (statutory definition confers upon a state magistrate who issued an original warrant jurisdiction to entertain an application pursuant to 18 U.S.C. § 2517(5)). Thus, Gotti's contention that the Government failed to minimize or seek an amendment is not supported by the record. Also, Zambouros' motion to suppress, is denied.

### III. SUPPRESSION OF FRUITS OF THE BASEMENT SEARCH

Gotti challenges the February 3, 1997 search of the basement in the apartment at 106–13 101st Avenue, Queens, New York. Gotti argues that 1) the probable

cause showing supporting the issuance of the first search warrant was tainted through a prior warrantless "sneak and peek" search, and 2) suppression of the fruits of the basement search is required because the search warrant was facially defective and the executing officers grossly exceeded its scope. A hearing was held on these issues on March 11, 1999. For the reasons stated below, Gotti's motion to suppress is denied.[6]

### A. *"Sneak and Peek" Search*

Citing the testimony of OCTF Special Investigator Diego Cruz, a participant in the basement search, at Gotti's January 29, 1998 detention hearing before Magistrate Judge Mark Fox, Gotti contends that the probable cause showing for the issuance of the February 2, 1997 search warrant for the basement search was tainted by a prior warrantless "sneak and peek" search. In particular, Gotti challenges Cruz's testimony that he was one of the first agents to arrive at the scene, that when he arrived, the combination lock on the door had been punched out, leaving the door—which was "ordinarily" locked—wide open, and that he and other members of his squad had previously conducted on-site surveillance of the premises.

This testimony, Gotti argues, raises the distinct possibility that the police were responsible for punching out the lock, and that prior to the February 3 execution of the warrant, law enforcement officers 1) secretly broke into the premises, 2) punched out the lock on the basement door, 3) effected an illegal warrantless search, 4) used the resulting observations to bolster a follow-up warrant application and/or 5) planted evidence with an eye to framing Gotti. Gotti points to the substantial sums of cash found on the premises as further evidence that information contained in the warrant application could

---

**6.** While the Government contends that Gotti has no standing to challenge the basement search, this Court need not decide that claim in light of its denial of Gotti's motion to suppress the fruits of this search.

only have come from an earlier covert entry.

Gotti's main basis for his conclusions is the testimony of Special Investigator Diego Cruz given at the January 29, 1998 detention hearing, which Gotti claims raises questions as to the occurrence of police misconduct. Gotti, however, has distorted Cruz's testimony, and has not shown that any false statements were made. A review of the January 29, 1998 transcript, with Cruz's testimony taken in context, makes clear that Cruz's recollections of the events surrounding the search were that on the day of the search he entered the hallway and saw that the basement door was closed with a combination lock that was not engaged, and that the other key-style locks were not engaged, allowing the officers to enter the basement without breaking either the locks or the door. But Cruz also testified that neither he nor the officers broke down the door in any way. This testimony raises no inference of police misconduct.

In addition, at the March 11, 1999 hearing, Cruz again credibly testified that when he arrived at the premises on February 3, 1997, the basement door was open, the key locks were not engaged, and the combination lock had been removed. He also noted that once he noticed that the door was open, he paid little attention to the condition of the locks. Cruz additionally testified that prior to that day, he had never been in the basement. Cruz's testimony, given over the course of two hearings, fails to substantiate Gotti's claim that a "sneak and peek" search of the premises occurred prior to the issuance of the first search warrant. Accordingly, Gotti's motion to suppress on these grounds is denied.

### B. *Validity of the February 2, 1997 Basement Search Warrant*

Gotti challenges the validity of the February 2, 1997 warrant that authorized a search the following day of the basement at 106–13 101st Avenue, Queens, New York. Gotti's challenge comes on several grounds: 1) there was no probable cause for the warrant; 2) the warrant was vague and overbroad; 3) the search exceeded the warrant's scope; and 4) neither the good faith, the plain view, nor any other exception to the exclusionary rule applies.

### 1. *Probable Cause*

In determining whether a warrant was sufficiently supported by probable cause, the reviewing court considers the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A magistrate or judge deciding whether to issue a warrant is dealing with probabilities, not technicalities because "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of rules." *Id.* at 231, 232, 103 S.Ct. 2317. As previously noted, the reviewing court should show substantial deference to a probable cause determination made by a detached and neutral judge, resolving any doubts in favor of upholding the warrant. *United States v. Rosa,* 11 F.3d 315, 326 (2d Cir.1993) (citing *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983)). Indeed, the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Illinois v. Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

When considered against these presumptions, this Court finds that the February 2, 1997 affidavit submitted by Ercole J. Gaudioso, a Special Investigator in the New York State Organized Crime Task Force, provided probable cause to support the issuance of a search warrant for the basement premises. Gaudioso's ten-part, eighty-seven page affidavit incorporated a number of prior affidavits and detailed the progress of the joint federal and state investigation into the activities of

the Gambino Family. The affidavit described, *inter alia*, what the investigators understood to be Gotti's racketeering activities through JAG Brokerage, the alleged shell corporation whose records the investigators hoped to find in the basement, and set forth facts tending, when taken in totality, to show that Gotti used the basement to store large amounts of cash.

 Gotti argues that because the searching officers did not find JAG Brokerage's business records in the basement, there was no probable cause. Because the existence of probable cause is determined on the strength of what is presented to the judicial officer, its existence does not depend on the fruits of the search. *See Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996) (analysis of probable cause is grounded in "historical facts" known to the searching officer prior to search).

Nor is Gotti's argument concerning the "staleness" of a February 27, 1996 conversation between McLaughlin and another party regarding the possible entrance into the basement by Con Ed workers and "a marshal" convincing. As the Government points out, reliance on this information suggesting concerns over the security of the basement is not precluded simply because it was a number of months old. The application supporting probable cause articulated facts that showed the existence of an ongoing criminal enterprise. These allegations were some evidence of its continuity. *See, e.g., Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991) ("When the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated acts, the passage of time between the last described act and the presentation of the application becomes less significant.") (citing *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981)).

 Likewise, Gotti's challenge to the statements of the cooperating witness who was relied upon in the affidavit fails as well. First, Gotti condemns as stale evidence provided by that witness, namely that the witness had engaged in several large-scale loansharking transactions, including one in excess of $150,000 with Gotti as creditor, and that the cash that he received from Gotti (which was retrieved by McLaughlin) came from a location in the vicinity of the Bergin Club and "typically exuded a musty stench, as if it had been stored in a damp location, or underground."

At the March 11, 1999 hearing, Gotti elicited testimony that the witness' cooperation had likely occurred in 1994, and the information received may have been based on events that occurred several years earlier. Again, however, the confidential informant's information tended to support the overall picture of an ongoing criminal enterprise, and as such, was not stale. *See Rivera, supra.* Further, when viewed under the totality of the circumstances, it was reasonable for the issuing judge to believe information from the informant that Gotti's alleged loansharking money, which bore a "musty order," was likely to have come from the basement of a building that McLaughlin owned. *See Travisano,* 724 F.2d at 346 (applicable standard is that "there be a fair probability that the premises will yield the objects specified in the search warrant") (citing *Gates,* 462 U.S. at 246, 103 S.Ct. 2317).

 Second, to the extent that Gotti challenges the reliability of the confidential informant, Gotti overlooks the fact that in his affidavit in support of his search warrant application, Gaudioso advised Justice Moore of the Bronx Criminal Court, who signed the warrant, as follows:

I am informed by members of federal law enforcement that their independent investigative efforts have failed to corroborate thoroughly all of the information obtained from the cooperating witness. Nevertheless, as detailed

throughout this affidavit, our investigation, through physical surveillance and court-authorized eavesdropping, has identified many of the persons named as Gotti Jr.'s subordinates by the cooperating witness as persons in regular attendance at routine Wednesday-evening meetings, held at the Bergin Hunt and Fish Club in the Ozone Park section of Queens, and elsewhere, by Gotti Jr., typically on Wednesday evenings. The cooperating witness has identified routine meetings at the Bergin Hunt and Fish Club as occasions when he secured from Gotti Jr. large sums of cash in connection with loan sharking transactions.

Def.Exh. E, at 10–11. Much of the informant's information, therefore, had been corroborated. To the extent that had not occurred, that fact was disclosed to the Justice. Thus, Gotti's challenge to the informant's reliability fails.

7. The February 2, 1997 warrant provided:

YOU ARE HEREBY AUTHORIZED to enter the above-captioned location, and to conduct a search thereof and of any container found in such location wherein any of the property of the property [sic] described below may be found; and to seize any such property if found in that location, as follows:
(1) property used to commit certain crimes, to wit: Commercial Bribery; Criminal Restraint of Trade in violation of §§ 340 and 341 of the General Business Law; Bribing a Labor Official; Bribe Receiving by a Labor Official; Criminal Violation of Labor Law § 220 (Failure to Pay Prevailing Wages on Public Contracts); Tampering with Public Records in the First Degree; Falsifying Business Records in the First Degree and Second Degree; Offering a False Instrument for Filing in the First Degree; Perjury in the Second Degree; Making an Apparently False Sworn Statement in the First Degree and Second Degree; Scheme to Defraud in the First Degree; Grand Larceny by False Pretenses; Grand Larceny by False Promise; Criminal Possession of Stolen Property; Promoting Gambling in the First and Second Degrees; Possession of Gambling Records in the First and Second Degrees; Criminal Usury in the First and Second Degrees; Possession of Usurious Loan Records; Grand Larceny by Extortion; Coercion in the First and Second Degrees; attempts to commit those crimes; conspira-

Were this Court writing on a clean slate, the issue of probable cause to search the basement would be an extremely close question. But given the totality of the circumstances and especially the deference that is to be granted the judicial officer who signed the warrant, this Court finds that the warrant application was supported by probable cause.

### 2. Overbreadth of Warrant

Gotti contends that both the preamble and the body of the February 2, 1997 basement search warrant were unconstitutionally overbroad, violating the particularity requirement of the Fourth Amendment because the warrant did not enable the executing officers to ascertain and identify with reasonable certainty the part of the basement to be searched or the items they were authorized to seize.

■ Gotti first argues that the warrant's preamble was overbroad on its face.[7]

cies to commit those crimes, which conspiracies include the commission of overt acts within the geographic jurisdiction of this Court; and Enterprise Corruption, committed by certain persons through patterns of criminal activity comprising acts constituting violations of those of the crimes enumerated above which are designated as "criminal acts" in Penal Law § 460.10(1)(d), in connection with such persons' ongoing employment by and in association with an ongoing criminal enterprise, namely the Gambino Crime Family, which patterns of criminal activity include the commission of predicate acts within the geographic jurisdiction of this Court; (2) property evidencing the commission of those crimes; and (3) property identifying, and tending to identify, the persons who have committed those crimes, and who have been victimized by the commission of those crimes; all such property consisting of the following:
—The business records of JAG Brokerage, including: financial ledgers; documents related to contracts to which JAG Brokerage has been a party, or in connection with which JAG Brokerage has transacted business; all payroll records, including bank statements, records of cash and check deposits and disbursements, account reconciliations, cancelled checks, check stubs, and check registers, for all payroll accounts, and for other accounts used to pay employees' income taxes; payroll ledgers, timecards; tax forms related to the salaries, and benefits paid by JAG

In support, Gotti cites a number of cases in which the warrants listed only criminal statutes and authorized searches for "any evidence" related to the commission of the listed crimes. *See, e.g., United States v. George,* 975 F.2d 72, 75–76 (2d Cir.1992) (invalidating as overbroad authorization to search for "any other evidence relating to the commission of a crime"); *United States v. Spilotro,* 800 F.2d 959, 965 (9th Cir.1986) (invalidating warrant where "the only limit on the search and seizure was the requirement that the items seized be evidence of a violation of any one of thirteen statutes, some of exceptional scope"); *United States v. Gigante,* 979 F.Supp. 959, 966 (S.D.N.Y.1997) (overbroad authorization to search for evidence of violation of RICO statute). By contrast, the warrant in question authorized a search for particular information and not just "any evidence" related to the commission of the crimes in question. To that end, in addition to listing the various criminal statutes at issue, the warrants described the particular types of property to be seized.

 Gotti next argues that the warrant's authorization to search for JAG's business records was unconstitutionally overbroad. JAG, however, was alleged to be a shell company with no actual office, which served as a conduit for money from a variety of illegal sources and, in effect, functioned purely as an instrumentality of racketeering. Consequently, the judicial concerns expressed in the cases Gotti cites—cases that condemn unfettered rummaging through places of business and indiscriminately seizing all business records—simply do not apply. *See, e.g., Spilotro,* 800 F.2d at 961 (jewelry store); *United States v. Leary,* 846 F.2d 592, 594 (10th Cir.1988) (corporate office); *Gigante,* 979 F.Supp. at 965 (carting companies' corporate offices); *United States v. Hickey,* 16 F.Supp.2d 223, 236 (E.D.N.Y.) (same),

*rev'd after reconsideration,* —— F.Supp.2d —— (1998).

In addition, where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized. *See, e.g., United States v. Regan,* 706 F.Supp. 1102, 1113 (S.D.N.Y.1989) ("The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated."). *See, e.g., George,* 975 F.2d at 76; *United States v. Scharfman,* 448 F.2d 1352, 1355 (2d Cir.1971); *United States v. Shakur,* 560 F.Supp. 337, 346 (S.D.N.Y.1983).

 Consequently, it is not necessary that specific documents be listed in the warrant, and, in this instance, the validity of the warrant is not affected by the scope of the search. *Regan,* 706 F.Supp. at 1114; *United States v. Wuagneux,* 683 F.2d 1343, 1352 (11th Cir.1982); *United States v. Heldt,* 668 F.2d 1238, 1254 (D.C.Cir.1981). Nor, in light of the circumstances and the fact that JAG Brokerage was believed to have served only as an instrumentality of racketeering, is the warrant defective because it contained no time limitations. *See, e.g., United States v. Blumberg,* No. 3:97–CR–119 (EBB), 1998 WL 136174, *7 (D.Conn. Mar.11, 1998) (lack of time frame for documents in warrant did not render warrant overbroad, where alleged criminal scheme was complex and of long duration, and where law enforcement agents could not identify the business records implicated with any more specificity).

Indeed, our Circuit and other Courts of Appeals have upheld warrants specifying broad categories of documents similar to those identified here. *United States v. Riley,* 906 F.2d 841, 844 (2d Cir.1990) ("In upholding broadly worded categories of

---

Brokerage, including W–2 forms, 1099 forms, W–4 forms, federal payroll forms 940 and 941, and withholding schedules; all documents pertinent to the corporate income taxes of JAG Brokerage; all materials identifying

officers, shareholders, agents, employees, subcontractors, independent contractors, supervisors, and other persons in control of JAG Brokerage; and
—United States currency.

items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items.") (citations omitted); *United States v. Kail*, 804 F.2d 441, 444–45 (8th Cir.1986) (approving seizure of "accounting ledgers, checkbooks, monthly statements, . . . customer files, client lists, letters and mailings from clients . . . ."); *Shaffer v. Wilson*, 523 F.2d 175, 180 (10th Cir.1975) ("fiscal records relating to · [defendant's] income and expenses").

■ Finally, Gotti claims that the basement warrant's authorization to seize United States currency is overly broad. Gotti cites *United States v. One Parcel of Property Located At 18 Perkins Road, Woodbridge, Connecticut*, 774 F.Supp. 699 (D.Conn.1991) in support of his argument. In that case, in order to purchase cocaine, a cooperating witness was given a sum of money whose serial numbers had been previously recorded. *Id.* at 705. Because the serial numbers had been recorded and were presumably available, the court held that there was no justification for the absence of those details on the face of the warrant. The court noted, however, that when "a more precise description is not possible," generic classifications of money in a warrant were acceptable. *Id.* (quoting *United States v. Bright*, 630 F.2d 804, 812 (5th Cir.1980)).

In this case, Gaudioso's affidavit established probable cause to believe that Gotti received cash proceeds from gambling, loansharking, and extortion on an ongoing basis, from a variety of sources. In the absence of knowledge of any serial numbers or other specifics regarding the money sought, the warrant's authorization to seize United States currency was not unconstitutionally overbroad. Gotti's motion to suppress the fruits of the basement search on the grounds of the warrant's overbreadth is denied.

### 3. *Search Exceeded Warrant's Scope*

Gotti argues that, when conducted, the basement search constituted a prohibited general search that exceeded the scope of the February 2, 1997 warrant. During that search, officers seized approximately $358,000 in cash, as well as evidence not specified on the face of the warrant, namely, lists of alleged organized crime members, guns and other property.

■ The February 2, 1997 search warrant authorized investigators to "conduct a search [of the basement premises] and of any container found in such location wherein any of the property . . . described below may be found." As previously noted, the property specified on the face of the warrant encompassed two categories: the business records of JAG brokerage and United States currency. Since the officers conducting the search were authorized to search "any container" in which either documents of any kind or size or cash could be found, they were justified in thoroughly searching the basement including the ceiling, the rafters, a refrigerator located in the basement and the area between a wall and a water heater. Gotti's contentions that these actions exceeded the warrant's scope is not persuasive.

■ In addition, the "plain view" doctrine justified the seizure of the items in addition to those specified on the face of the warrant. The plain view doctrine allows law enforcement officers in certain circumstances to seize evidence without a warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971). Under this doctrine, in order to justify the seizure of the evidence in plain view, the initial intrusion must have been lawful, and the police must have probable cause to believe that the item seized was evidence of a crime. *United States v. Delibac*, 925 F.2d 610, 613 (2d Cir.1991). Further, if "it is immediately apparent that [an] object is connected with criminal activity . . . and where such search and seizure do not involve an invasion of privacy," agents may seize items not listed on a search warrant. *George*, 975 F.2d at 78 (citations omitted).

Here, the warrant expressly authorized the search of the basement, including any

containers that could hold cash and other items listed. The officers' search was therefore a lawful exercise of their authority and yielded a loaded .25 caliber Derringer, a .32 caliber semiautomatic handgun with silencer, and an AR–15 semi-automatic assault rifle. Because it was immediately apparent that these items constituted evidence of criminal offenses, namely, various degrees of Criminal Possession of a Weapon, in violation of §§ 265.01(1), 265.02(2), 265.02(4) of the New York State Penal Law, and chapter 10 of the New York City Administrative Code,[8] their seizure under the plain view doctrine was, therefore, permissible.

Gotti also contests the seizure of his wedding list and alleged organized crime promotion lists, which allegedly contained the names of living and dead members of several crime families. The officer who discovered and seized the evidence, however, had extensive training and experience in the investigation of organized crime. Consequently, the value of those documents, which allegedly established the existence, structure, and protocol of La Cosa Nostra, was immediately clear to him as constituting direct evidence of Enterprise Corruption (the state RICO analogue) committed through the affairs of the Gambino Family. The officers' search and seizure of the basement did not, therefore, exceed the scope of the warrant. Gotti's motion to suppress on those grounds is denied.

#### 4. Good Faith Exception

In any event, even if the warrants were overbroad or issued without sufficient

probable cause, the good faith exception to the exclusionary rule would prevent suppression. Under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the test of an officer's good faith is an objective one: "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420. The *Leon* Court recognized four instances where the good faith exception would not apply:

> (1) where the issuing magistrate has been knowingly misled, (2) where the issuing magistrate knowingly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir.1992); *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421.

Gotti has not shown that any of the exceptions to *Leon* apply in this case. First, as previously noted, Gotti's claim that an initial warrantless "sneak and peek" search misled the judge and tainted the probable cause showing for the February 2, 1997 warrant has not been substantiated. In addition, Gotti suggested at the March 11, 1999 hearing that Gaudioso's February 2, 1997 warrant affidavit purposely withheld from the judge the dates on which he learned from the confidential informant that money was stored in the

---

8. In the March 11, 1999 hearing, Gotti specifically sought suppression of the .32 caliber semiautomatic handgun with silencer that was found in the rafters of the basement. In particular, Gotti questioned the actions of Officer Timothy Betlewicz, who found the gun, who could not recall the details of the briefing prior to the execution of the search warrant, and who testified to his belief that the searching officers were looking to recover any evidence that they could find. Investigator Gaudioso, however, testified that before the

search warrants were executed, he met with all of the searching officers and their team leaders, reviewed the warrants with them, and supplied each team with a number of copies of the warrant. In any event, the search warrant authorized the opening of containers that could hold items listed in the warrant. Thus, the search into the rafters—and the opening of the bag that held the gun with the silencer—was within the scope of the warrant.

basement and the actual time period to which the informant referred.

Gaudioso testified, however, that he did not put into the warrant affidavit all the relevant information he had learned in the twenty-eight months he had spent investigating the Gambino Family, that he knew about the doctrine of staleness and that its application varied, depending on the circumstances. Although this is a close question, we find the first exception is, nonetheless, inapplicable.

Second, in view of the content and detail in the warrant applications, Gotti has not demonstrated that the issuing judge wholly abandoned his judicial role. Third, while Gotti challenges the probable cause for the warrant applications, this Court cannot say that the existence of probable cause was an unreasonable conclusion, given the detail in the supporting affidavits. Finally, Gotti has not established that the warrants were so facially deficient that a reasonable officer would have known not to rely on them. Accordingly, the officers were entitled to rely in good faith on that warrant.

For all of the foregoing reasons, Gotti's motion to suppress the fruits of the basement search is denied.

### IV. FEBRUARY 3, 1997 SEARCH OF SUTPHIN BOULEVARD OFFICE

Gotti moves to suppress the fruits of the search at 97–11 Sutphin Boulevard in on the grounds that the warrant was unconstitutionally overbroad on its face. The warrant for this search was issued contemporaneously with the warrant for the basement search and on the same Gaudioso affidavit, and was substantially identical to—though Gotti contends even more expansive than—the warrant for the basement search.

The warrant for the Sutphin Boulevard premises included language seeking proceeds, instrumentalities and evidence identifying the victims and perpetrators of twenty-eight state crimes. The warrant included the same language regarding JAG Brokerage's business records as the warrant for the basement search. In addition, the warrant sought income tax records for various businesses, documents related to certain construction projects, telephone directories and other documents reflecting the identities of persons who had allegedly committed certain crimes, and any printed or electronic records of specified activities.

For the reasons stated above with respect to the warrant for the basement search, the warrant for the Sutphin Boulevard premises was not unconstitutionally overbroad on its face, and, in any event, is also subject to the *Leon* exception. Gotti's motion to suppress the fruits of that search is denied.

### V. SUPPRESSION OF FRUITS OF OCTOBER 7, 1997 SEARCH OF NICODAN TELECOMMUNICATIONS

Defendants Gotti and Plomitallo contend that the fruits of the October 1997 Nicodan Telecommunications search should be suppressed because (1) the warrant was unconstitutionally overbroad, and (2) the affidavit of Special Agent Perrotta offered to establish probable cause contained false statements. For the reasons that follow, the motion is denied.

The defendants contend that the October 7, 1997 warrant was unconstitutionally overbroad since, by providing no readily ascertainable guidelines as to what items were to be seized, it essentially authorized a general search of the premises.

The warrant stated the following:

YOU ARE HEREBY AUTHORIZED to enter [97–11 Sutphin Boulevard], and to conduct a search thereof and of any person found therein, and to search any container found in such location or on such person wherein any of the property described below may be found; and to seize any such property if found in that location and/or on such person, as follows: (1) property used to commit cer-

tain crimes, to wit: Grand Larceny, in violation of Article 155 of the New York State Penal Law; Scheme to Defraud in the First Degree, in violation of section 190.65 of the New York State Penal Law; violations of sections 1804 and 1805 of the New York State Tax Law (relating to the filing of false personal and corporate income tax returns); and violations of sections 1810 of the New York State Tax Law (relating to the failure to pay personal and corporate income tax); (2) property evidencing the commission of those crimes; and (3) property identifying, and tending to identify, the persons who have committed those crimes, and who have been victimized by the commission of those crimes; all such property consisting of the following business and financial records, to the extent that such were produced between April 1996 and the present:

A. Documents related to business transactions in which Nicodan Telecommunications, and/or John A. Gotti, and/or Anthony Plomitallo, and/or Steven Dobies, and/or Delmy Avila, and/or Michael Zambouros, have engaged, as well as all contracts to which Nicodan Telecommunications, and/or John A. Gotti, and/or Anthony Plomitallo, and/or Steven Dobies, and/or Delmy Avila, and/or Michael Zambouros, have been parties, or in connection with which Nicodan Telecommunications, and/or John A. Gotti, and/or Anthony Plomitallo, and/or Steven Dobies, and/or Delmy Avila, and/or Michael Zambouros, have transacted business, all such transactions and/or contracts relating to the marketing of telephone service access codes, specifically toll-free (or "1[800]" or "1[888]" numbers) and personal identification numbers (or "PINS"), under any of the following brands of pre-paid calling cards and/or involving any of the following firms or persons: Q–Card, MVP Card, Liberty Card, Travel Card, and any other prepaid calling cards found [in 97–11 Sutphin Boulevard], AT & T, SPRINT, MCI, Tel–Central Communications, H.G. Telecom, Inc., Universal Communications Network, Inc. ("UCN"), Atlas Communications, SMS Q–Card, Inc., Frank Cali, Vincent Annunziata, Salvatore Scala, Michael DiGiorgio, Steven Chaplain, Anthony Amorous; all such documents to consist of contracts, subcontracts, purchase orders, invoices, and receipts for payment, as well as memoranda of communications between and/or among any of the aforesaid firms and/or persons;

B. Property evidencing the quantities and monetary values of telephone service access codes marketed under the brand names Q–Card, MVP Card, and Liberty Card, as well as any other prepaid calling cards found in [97–11 Sutphin Boulevard], and evidencing the identities of actual access codes marketed through any of these brand names, such property to include actual pre-paid calling cards bearing these brand names, as well as contracts, subcontracts, purchase orders, invoices, receipts for payment, and related memoranda, as pertinent to the marketing of telephone calling services through the distribution of access codes under such brand names, and as pertinent to the manufacturing and printing of such brand names, and as pertinent to the distribution of such brand-name cards;

C. Telephone directories and other memoranda containing the names, addresses, telephone numbers, pager numbers, and other data reflecting the identities of the persons and firms enumerated in paragraph A, above;

D. Records of the proceeds generated by the distribution of the above-named pre-paid calling cards brands, including the financial records of Nicodan Telecommunications, and any other firms or persons if such records reflect the generation of income by the distribution of the pre-paid calling card brands named in paragraph A, above, as follows: cash receipts and disbursements journals;

bank statements; records of check deposits and disbursements; account reconciliations; canceled checks; check stubs; and check registers; for all operating, expense and payroll accounts of Nicodan Telecommunications, and/or other firms engaged in the distribution of the above-named pre-paid calling card brands;

E. Records containing information related to Nicodan Telecommunication's' liability for and payment of corporate income tax (including documents of the type listed in paragraph D, above), and related to Nicodan Telecommunication's payment of income, in the forms of salaries, commissions, bonuses, and loans to John A. Gotti, as follows: payroll records; bank statements; records of cash and check deposits and disbursements; account reconciliations; canceled checks; check stubs; check registers; W–2 forms; 1099 forms; W–4 forms; federal payroll forms 940 and 941; Gotti's individual and Nicodan's corporate income tax returns; and withholding schedules.

▆▆▆▆ The warrant contained a finite list of detailed items and was not impermissibly broadened by a catch-all provision authorizing a search for evidence of a commission of any crime. *See George*, 975 F.2d at 74 (warrant impermissibly authorized the seizure of any other items which are evidence of violations of a crime). It is well established that the fact that a significant amount of material falls within the warrant's scope is not enough to establish a deficiency of constitutional magnitude. *See Heldt*, 668 F.2d at 1254; *Wuagneux*, 683 F.2d at 1352. For the reasons stated, *supra*, Point III, B.2, with respect to the warrant for the basement search, the October warrant for the Sutphin Boulevard premises was not unconstitutionally overbroad on its face.

The defendants also claim that the Perrotta Affidavit submitted in support of the warrant only purported to demonstrate probable cause to search in connection with the MVP Card and the Q–Card, but the warrant sought documents relating to "any other prepaid calling cards." Moreover, the supporting Affidavit mentions numerous calling card names and also supplied information regarding pre-paid calling cards such as Travel Card, World Travel Card and Liberty Card. These averments were sufficient to justify the challenged language in the warrant.

Assuming *arguendo*, the warrant was overbroad, suppression would not be warranted because it was objectively reasonable for the officers to believe the warrant was facially valid. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see, supra*, Point III, B.4.

The defendants seek a *Franks* hearing and suppression on the ground that the Affidavit of Special Agent Perrotta (which was incorporated into Special Investigator Gaudioso's Affidavit in support of the application for the search) contained materially false statements. As stated below, *see infra* Point VI, to receive a *Franks* hearing, the defendants must make a substantial preliminary showing of deliberate falsehood or reckless disregard for the truth. The defendants claim that four statements by Agent Perrotta were intentionally false.

First, the defendants claim that Perrotta's interpretation of a conversation between Gotti and Plomitallo was false and "there [was] nothing in the conversation ... that could be construed as suspicious or fraudulent." Perrotta stated:

In this conversation, Gotti overtly manifested most of the essential elements of the scheme outlined above: the exploitation of extensions of credit; the use of numerous brands of cards; the use of the complex structure of the industry to evade detection for marketing inoperable cards; the intent to market a variety of card brands in succession to one another.

The interpretation was included in the Affidavit following a statement of the text of the conversation between Gotti and Plomi-

tallo, and permitted the judge reviewing the application to reach his own conclusions concerning the conversation. In any event, given the entire context of the investigation, Perrotta's interpretation is reasonable and does not evidence deliberate falsity or reckless disregard for the truth.

In the same conversation between Gotti and Plomitallo, Perrotta attributed. the word "bustin" to Gotti, in the following exchange:

Gotti: I was thinking of [Zambouros] for California, I was thinking of bustin'

Plomitallo: He's, he's got distribution there. He's got people that want cards already.

Gotti: I was thinking about, we make an agreement with him regard the Q card, become, aw, like sort of our main distributor in California.

Later in the Affidavit, Agent Perrotta states that Gotti's use of the word "bustin" is a reference to defrauding creditors. The defendants claim, however, that the context makes clear that Gotti is referring to "Boston," not "bustin." Given this context, it is plausible that Gotti is referring to "bustin." Plomitallo's response to Gotti did not ask for any clarification between California or Boston, and Gotti's second statement refers to making Zambouros a distributor in California, not Boston.

Thirdly, the defendants attack Perrotta's statement that, "It was at this time of this drastic increase in credit to Tel Central that Plomitallo and Zambouros discussed the fact that the name of MVP Card would soon have to be changed." In a June 20, 1996 conversation, a draft transcript of which was provided to the issuing judge, Plomitallo stated to Zambouros that the name of MVP would have to be changed. Subpoenaed MCI records showed that MCI had extended to Tel Central about $1.7 million in credit in or about May 1996. Gotti contends that Tel Central's failure to pay MCI does not tend to show that the MVP Card was involved in fraud. Again, Agent Perrotta's infer-

ences were reasonable given the other facts submitted and the *modus operandi* of the pre-paid calling card scheme that was under investigation, and are simply not examples of statements made with reckless disregard for their truth.

Finally, the defendants attack Perrotta's interpretation of a June 20, 1996 conversation which was included in the Affidavit:

Plomitallo: We gotta change the name of the, the MVP Card. Something (I) Cacci said.

Zambouros: Why?

Plomitallo: Something (I) Cacci said.

In a footnote, Perrotta notes, "Organized crime intelligence sources report that Thomas ("Cacci") Cacciopoli is a made member of the Gambino Family, in the crew headed by John A. Gotti." The defendants contend, and the Government concedes, that the reference to "Cacci" should have been transcribed as "catchy." The Government notes, however, and the Court agrees, that Perrotta's interpretation was reasonable, given the close similarity in the pronunciation of the words, and not a deliberate falsehood. *See United States v. Campino*, 890 F.2d 588, 592 (2d Cir.1989) ("Franks does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'"), *cert. denied*, 498 U.S. 866, 111 S.Ct. 179, 112 L.Ed.2d 143 (1990).

■ Gotti's dispute with Agent Perrotta's interpretations of conversations does not warrant either a *Franks* hearing or suppression. The conversations at issue, on occasion, are ambiguous. Reasonable differences over them, however, fall short of establishing deliberate falsehood or reckless disregard for the truth by Perrotta. *See United States v. Fury*, 554 F.2d 522, 530–531 (2d Cir.1977) (motion to suppress for lack of probable cause denied where intercepted conversations which were somewhat ambiguous, were not unreasonably interpreted as criminal; taken together with other information that had

been disclosed by the investigation, there was ample demonstration of probable cause), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Jimenez,* 824 F.Supp. 351, 361 (S.D.N.Y. 1993) ("A defendant's submission of his own counter-interpretations of acts, however, does not satisfy the showing required for a *Franks* hearing."). Further, even if Gotti's proffered conclusions were more plausible than Agent Perrotta's interpretations, he has failed to demonstrate that Perrotta's interpretations were deliberate falsehoods instead of anything other than subtle differences over ambiguities in intercepted conversations. *See Jimenez,* 824 F.Supp. at 361 n. 4.

In any event, without the challenged statements, the Affidavit contained a sufficient basis for the issuing justice to conclude there was probable cause to issue the search warrant for Nicodan. Notably, the Affidavit contained a discussion of an alleged tax evasion scheme based on, *inter alia,* Perrotta's discussions with OCTF Special Investigator Marie Boss, a forensic accountant, who had reviewed Nicodan's bank records and noted its modest bank account despite large sales. The Affidavit was also based on Gotti's sole accountant's statement that he had never been informed of any income from Gotti's telecommunications business, and on intercepted conversations. Thus, defendant's motion for a *Franks* hearing and to suppress is denied.

**VI.** *SUPPRESSION OF FRUITS OF SEARCH AND WIRETAP APPLICATIONS IDENTIFYING GOTTI AS A MEMBER, CAPTAIN OR BOSS OF THE GAMBINO FAMILY AND/OR INCORPORATING A DECEMBER 12, 1995 PEN REGISTER APPLICATION*

Gotti contends that the Title III and search warrant applications targeting him were infected by statements, material to Justice Miller's determination of probable cause, that were either deliberately false or reckless and were improperly offered to show that he was a "made" member or boss of the Gambino Family. As a consequence, he contends that he is entitled to a *Franks* hearing, and subsequent suppression of any intercepted communications where authorization depended on his identification as acting boss. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Gotti's motion focuses largely on the inconsistency between information supplied by Organized Crime Task Force (OCTF) Special Investigator Joseph Coffey, and Coffey's later public, televised statements after he left public service. Until mid–1996, Agent Coffey was employed as a Special Investigator at the OCTF with the responsibilities for collecting, analyzing and disseminating to OCTF's various investigative teams intelligence about the membership of organized crime groups. Coffey supplied various information to Heintz, who submitted an affidavit in support of the December 12, 1995 pen register, and to Agent Perrotta, who submitted an affidavit in support of the December 20, 1995 eavesdropping warrant.

Gotti contends that at the heart of the affidavits of Heintz and Perrotta was the allegation that Gotti was the acting boss, and that this information came from Agent Coffey. Gotti contends that suppression is required because this material information, which was later contradicted by Coffey himself, was critical to Justice Miller's probable cause determination. Gotti also claims that because these applications were incorporated into later ones, they too were tainted and their fruits must be suppressed.

The Heintz Affidavit in support of the December 12, 1995 pen register and the Perrotta Affidavit in support of the December 20, 1995 eavesdropping warrant both stated:

> John Gotti Jr. was identified in testimony in 1992 by Salvatore Gravano, as a caporegime in the Gambino Crime Family. Organized crime intelligence

sources, including the *FBI, OCTF, and the Manhattan District Attorney's Office, now identify Gotti Jr. as the Acting Boss of the Family, performing the functions of his incarcerated father.* As indicated below, our investigation has gathered evidence of John Gotti Jr. granting, and denying, permission for Gambino caporegimes to conduct certain criminal transactions in the construction industry. *According to Special Investigator Coffey, such power is indicative of that typically wielded by members of the Gambino administration.*

(emphasis added).

The Heintz application described Coffey's areas of expertise and purported to rely on him regarding the general structure and operation of the Gambino Family, the *modus operandi* of its loansharking and labor racketeering operations and the role of deceased Gambino "capo" Joseph Zingaro in the construction industry. The information proffered in the Perrotta's eavesdropping application of December 20, 1995 also relied on Coffey, essentially tracking the same information supplied in the pen register application.

In a television interview on March 12, 1997, Agent Coffey stated in reference to Gotti:

> He's not even made. The kid is one-quarter Jewish, you have to be 100% Italian to be made. He is not even considered to be a made solder in the Gambino family, much less the Boss.

This statement is said to demonstrate the falsity of information relayed by Coffey to Heintz and Perrotta in 1995.

■ *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), as previously noted, defines the circumstances under which a defendant may challenge a finding of probable cause for a warrant and obtain an evidentiary hearing. That relief is available only:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and ... the allegedly false statement is necessary to the finding of probable cause.

*Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. *Franks* also established that the challenger's attack must be more than conclusory, and the allegation of "deliberate falsehood" or "reckless disregard for the truth," "must be accompanied by an offer of proof." *Id.* at 171, 98 S.Ct. 2674.

■ Under *Franks,* three threshold elements are required before a hearing is warranted: (1) that the warrant affidavit contains a false statement, (2) that the statement was knowingly false or made with reckless disregard for the truth, and (3) that the allegedly false statement is necessary to a finding of probable cause. Thus, if the affidavit, when all knowing falsehoods are stricken, still contains sufficient facts to establish probable cause, no *Franks* hearing is necessary.

■ Notably absent from Gotti's motion is any clear or meaningful contradiction by him of the assertions in the Heintz and Perrotta applications that Gotti holds a leadership position in the Gambino Family. In the absence of this offer of proof from Gotti, *Franks* does not mandate an evidentiary hearing.

Nor has Gotti made a substantial preliminary showing that Coffey's or the affiants' statements were deliberately false or proffered with a reckless disregard for the truth. Neither application depended on Gotti's exact position or relied upon Coffey for an express identification of Gotti as a "made" member of the Gambino Family. Coffey's expertise was used to explain the background and structure of the Gambino Family and certain patterns of activity within *La Cosa Nostra.* Notably, Coffey did not deny the existence of the Gambino Family or *La Cosa Nostra* in the television interview. In any event, the only reliance on Coffey which related directly to Gotti was Coffey's conclusion that certain con-

duct was indicative of power within the Gambino Family's administration. But the characterization of Gotti as an influential Gambino Family member came from other sources that Gotti has not challenged and, thus, is an assertion Gotti has not shown to be demonstrably false.

As the Heintz Affidavit submitted in defense of this motion points out, Agent Coffey shared with investigators information which was incorporated into the Heintz and Perrotta affidavits from a variety of sources identifying Gotti as a leader of the Gambino Family. Thus, Coffey supplied the affiants, not simply with his opinion, but with other information from, for example, the FBI and the Manhattan District Attorney's Office, not predicated on his credibility, tending to indicate Gotti's leadership role.

This information included: (1) a copy of the transcript of the testimony of former Gambino Underboss Salvatore ("Sammy the Bull") Gravano, given during the 1992 federal murder and racketeering trial of John J. Gotti in which Gravano authenticated a Government exhibit which depicted the Gambino Family's leadership that identified Gotti Jr. as a leader, (2) a Government exhibit depicting the Gambino Family leadership, and (3) an excerpt from OCTF intelligence summary of the Gambino Family's leadership that identified Gotti as Acting Boss.

Even assuming, *arguendo*, that Gotti had made a substantial preliminary showing of deliberate falsehood, a *Franks* hearing is necessary only when probable cause is lacking after the material that is allegedly false is set aside. *Franks*, 438 U.S. at 171–172, 98 S.Ct. 2674. Here, were the assertions by Coffey concerning power in the Gambino Family excised, there was still probable cause for the warrant to have

issued since probable cause to conclude that Gotti played a leadership role in the Gambino Family came from a number of other sources. The motion for a *Franks* hearing and suppression is denied.

## VII. *SUPPRESSION OF MARION PRISON TAPES*

Gotti moves to suppress all audio and video surveillance of Gotti's private visiting room conversations with his father at the federal prison in Marion, Illinois (the "Marion Tapes") on the grounds that they were obtained without a warrant, in violation of Title III and the Fourth, Fifth, and Eighth Amendments to the United States Constitution.[9]

Title III generally forbids the intentional interception of telephonic communications, even communications made from prison, when done without court authorization. *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987). An exception to that general rule, however, provides:

> It shall not be unlawful for a person acting under color of law to intercept a wire, oral or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c). Under this statute, the consent of only one of the parties to the conversation allows monitoring of that conversation. While Gotti does not dispute the fact that he gave his implied consent to the prison recordings, he argues that the relevant question is the scope of consent, contending that Gotti, Sr. did not consent to the taping of calls as part of the criminal investigation of this case.

*See, e.g., Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.").

---

9. While Gotti claims that use of the Marion tapes violates First Amendment rights as well, his brief makes clear that he is contending that his *father's* First and Fifth Amendment rights of association are being violated. Gotti, however, has no standing to challenge violations of his father's constitutional rights.

■ Both Gotti and Gotti, Sr. consented to the monitoring and recording of their telephonic communications during visits. When he visited his father in Marion, Gotti routinely signed the "Notification to Visitor" form, indicating that he agreed that "All persons entering upon these premises are subject to routine searches of their person, property (including vehicles), and packages," and also that he understood "that the visiting area, including restrooms in the visiting area, may be monitored to ensure institution security and good order."

In addition, soon after Gotti, Sr. entered the Marion Penitentiary in June 1992, he was given a BP–407 form to sign entitled "Acknowledgements of Inmate." Item # 3 of that form, "Monitoring of Inmate Telephone Calls," provides:

> The Bureau of Prisons reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. An inmate's use of institutional telephones constitutes consent to this monitoring. A properly placed phone call to an attorney is not monitored.

Gotti, Sr. signed the portion of the form indicating that this notification had been read to him and that he understood that telephone conversations could be monitored and recorded. To that end, there was a sign above each telephone over which visitors would speak to inmates, providing that:

> Pursuant to Bureau of Prisons inmate telephone regulations, all conversations on this telephone are subject to monitoring. Your use of this telephone constitutes consent to this monitoring. You must contact your unit team to request unmonitored attorney calls.

■ Where, as here, the institution has advised inmates that their telephone conversations are subject to monitoring, and has posted a notice to the effect that use of the telephones constitutes consent to the monitoring, "the inmates' use of the telephones constitutes implied consent to the monitoring within the meaning of Title III." *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir.1988) (citing *Amen*, 831 F.2d at 379). Further, "to be an oral communication that is protected by Title III, the speaker must have had a subjective expectation that the communication was not subject to interception, and this expectation must have been objectively reasonable." *Id.* at 22 (citations omitted).

In *Willoughby*, two defendants moved to suppress a telephone conversation between Quintin, an inmate at the New York Metropolitan Correctional Center who was awaiting trial, and Willoughby, who at the time of the conversation was outside the Correctional Center. During the challenged conversation, the two discussed preventing testimony by an unnamed person. The Court of Appeals affirmed the District Court's rejection of the defendants' Title III arguments, finding that Quintin's signing of a form stating that he understood that the telephone calls he made from prison could be monitored and recorded constituted Quintin's express consent to the taping, and that "the consent of Quintin alone, as a party to the conversation, sufficed to avoid the prohibitions of Title III." *Id.* at 20. Likewise, in this case, even if Gotti did not consent to the monitoring of his telephone conversations with his father, Gotti, Sr.'s consent suffices to allow use of the recorded prison conversations.

Nor would use of the taped prison conversations violate Gotti's Fourth, Fifth, or Eighth Amendment rights. With respect to Gotti's Fourth Amendment right, our Circuit has squarely rejected the argument that his privacy rights were violated, especially given Gotti, Sr.'s express consent to the monitoring and Gotti's execution of the Notification to Visitors form. *See, e.g., United States v. Workman*, 80 F.3d 688, 694 (2d Cir.1996); *Willoughby*, 860 F.2d at 22 ("the interception of calls from inmates

to noninmates does not violate the privacy rights of the noninmates"); *see also United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Fourth Amendment does not prohibit use of recorded conversations where one party is complicit in the monitoring).

■ With respect to 'Gotti's Fifth Amendment claim, he contends that if the recordings of the telephonic communications were done for investigative purposes, his Fifth Amendment rights were violated because he did not receive *Miranda* warnings. No *Miranda* issues arise, however, unless a person is in custody and is subjected to interrogation by law enforcement. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation."); *California v. Beheler*, 463 U.S. 1121, 1123–24, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). When he visited his father, Gotti went of his own accord and was free to leave at any time. Thus, he was not in custody, and he has made no claim that he was subjected to official interrogation. Accordingly, Gotti's claim that his Fifth Amendment rights were violated fails.

Finally, Gotti's Eighth Amendment claim fails as well. There is no authority for the proposition that requiring an inmate to choose between no calls or visits, and monitored and recorded calls and visits amounts to cruel and unusual punishment. Nor can Gotti assert Eighth Amendment rights for his father. Gotti's motion to suppress the Marion prison tapes is denied, as is his request for a hearing on this issue.

## VIII. *JURISDICTION OVER FEBRUARY 2, 1997, FEBRUARY 4, 1997, AND OCTOBER 7, 1997 SEARCH WARRANTS*

Gotti contends that the search warrants issued by New York State court judges on February 2, 1997, February 4, 1997, and October 7, 1997, were governed by Rule 41(a) of the Federal Rules of Criminal Procedure because they were executed during the course of a joint federal and state investigation. Gotti argues that because the state court judges who issued the search warrants sat in Bronx County, part of the Southern District of New York, those judges lacked federal jurisdiction to approve searches in Queens County, located in the Eastern District of New York and, consequently, the warrants in question were void *ab initio*, and suppression of fruits derived from their execution is required.

■ Rule 41(a) of the Federal Rules of Criminal Procedure provides:

> Upon the request of a federal law enforcement officer or an attorney for the government, a search warrant authorized by this rule may be issued (1) by a federal magistrate judge, or a state court of record within the federal district, for a search of property or for a person within the district …

Fed.R.Crim.P. 41(a). The text of this Rule limits its application to warrants requested by federal officers. In this case, the February 2 and February 4, 1997 warrants were issued by a state judge based on the affidavit of a state law enforcement officer. The fact that there was, at that point, federal involvement in the investigation does not render Rule 41(a) applicable to those warrants. *See, e.g., United States v. McKeever*, 905 F.2d 829 (5th Cir.1990) (although state officer consulted with federal agent before applying for warrant and federal agents assisted in warrant's execution, Rule 41 did not apply where warrant was requested by state officers, alleged violations of Texas law, and was issued by a state judge); *United States v. Burke* 517 F.2d·377, 382 (2d Cir.1975) ("the mere fact that property seized pursuant to the warrant of a state judge at the request of state

law enforcement officers for violation of state law is offered in a federal prosecution does not implicate the requirements of [Rule 41]"). Accordingly, Rule 41 does not apply to the February 2 and February 4, 1997 warrants.

■■■ Even if the issuance of the warrants violated Rule 41, however, suppression would not result unless "(1) there was 'prejudice' in the sense that the search might not have occurred ... if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Burke,* 517 F.2d at 386–87. Gotti argues, however, that courts recognize an exception to the "prejudice" requirement for "fundamental" transgressions of a "quasi-constitutional" nature.

In this case, the fact that a state court judge present in the Southern District of New York issued a warrant to be executed in the Eastern District does not rise to a "quasi-constitutional" violation, and did not prejudice Gotti. As the Government points out, under New York state law, "[a] search warrant issued by ... the New York City criminal court or a superior court judge sitting as a local criminal court may be executed pursuant to its terms anywhere in the state." New York Criminal Procedure Law § 690.20(1) (McKinney 1995).

There is no question that state law was followed with respect to the warrants. In addition, the Bronx County judge who authorized them was a detached, neutral judicial officer whose name appeared on the face of the warrants. And, as previously discussed, this Court has determined that the warrants in question were validly issued, supported by an ample showing of probable cause, and were not defective on their face or unconstitutionally overbroad. As a result, Gotti was not prejudiced by the issuance of the warrants.

Further, assuming Rule 41 applies, Gotti makes no showing that there was any intentional or deliberate disregard of its provisions. Indeed, the applications for all of the warrants in question indicated that federal and state authorities were cooperating in the investigation of the Gambino Family. Where, as here, there is neither prejudice to a defendant nor intentional or deliberate disregard of the provisions of Rule 41, there is no reason to suppress the evidence seized in reliance on the warrants. Accordingly, Gotti's motion to exclude the evidence obtained as a result of the search warrants of February 2, 1997, February 4, 1997, and October 7, 1997 is denied.

## IX. JURISDICTIONAL PROFFER WITH RESPECT TO TITLE III WARRANTS

■■■ Gotti seeks a proffer from the Government establishing that the Title III warrants were issued by a court of competent jurisdiction, i.e., that the monitoring of the conversations, if not the intercepted conversations themselves, occurred within "the jurisdiction of the issuing justice[s]." *People v. DeLaCruz,* 156 Misc.2d 284, 288, 593 N.Y.S.2d 167, 170 (Sup.Ct.1992). Under this rule, the issuing justice's jurisdiction must include either the facility over which the intercepted conversations occur or the location where agents actually overhear and record the targeted communications. *United States v. Rodriguez,* 968 F.2d 130, 135–36 (2d Cir.1992).

In response to Gotti's request, the Government has submitted an affidavit from Heintz indicating that in the instances of the First, Third, and Fourth Warrants, the issuing justices had geographic jurisdiction over both the targeted facilities and the plants. In the instance of the Second Warrant, the issuing Justice had geographic jurisdiction over the targeted facility. Accordingly, this Court finds that the eavesdropping warrants pertinent to this case were issued by judges of competent jurisdiction.

## X. DISMISSAL OF RACKETEERING ACTS

Gotti and Zollo seek dismissal of certain Racketeering Acts charged in the Indict-

ment on the ground that they are not sufficiently related to the pattern of racketeering alleged. Gotti contests Racketeering Act Ten (hereinafter referred to as Racketeering Act Seven of S9) that charges a robbery conspiracy. Zollo contests Racketeering Acts 9, 39 and 40 (hereinafter referred to as Racketeering Acts 6, 38 and 39 of S9). Racketeering Act 6 charges Zollo with attempting to collect by extortionate means $21,000 in Zollo Construction Corp. funds loaned to a drug dealer, and Racketeering Acts 38 and 39 charge him with mail fraud relating to prevailing wage violations by Zollo Construction Corp.

 It is settled that "to prove a pattern of racketeering activity . . . a prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195, (1989). To prove that the predicate acts are related, the Government must show both that the racketeering acts relate to each other ("horizontal relatedness"), and that the racketeering acts relate to the enterprise ("vertical relatedness"). *See United States v. Long*, 917 F.2d 691, 697 (2d Cir.1990); *see also United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir.1992). Horizontal relatedness can exist if the racketeering acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893; *see also United States v. Simmons*, 923 F.2d 934, 951 (2d Cir. 1991); *United States v. Wong*, 40 F.3d 1347, 1374 (2d Cir.1994). Additionally, "[t]wo racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise." . *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (en banc).

 The Government may prove the vertical relationship by showing either: (1) that the offense related to the activities of the enterprise, or (2) that the defendant was able to commit the offense solely because of his position in the enterprise. *See Minicone*, 960 F.2d at 1106. The offense need not be in furtherance of the enterprise's activities to be related to the activities of the enterprise. *See United States v. Miller*, 116 F.3d 641, 676 (2d Cir.1997) (citation omitted).

 Count One charges numerous defendants in a racketeering conspiracy, with all defendants alleged to be members or associates of the enterprise—the Gambino Family. The alleged pattern contains a series of acts extending over a significant period of time. The Racketeering Acts include: extortionate schemes at Scores night club, collecting extensions of credit using extortionate means, fraudulent activity pertaining to Zollo Construction and gambling. The fact that every defendant is not charged in every predicate act is not fatal. *See United States v. Persico*, 621 F.Supp. 842, 851 (S.D.N.Y.1985) (joinder was proper even though all defendants charged in a substantive and RICO conspiracy had participated in different parts of an overall scheme or conspiracy).

The pattern of racketeering alleged against Gotti in the Indictment consists of extortionate schemes at Scores lasting over a period of years (Racketeering Acts 1–3), robbery (Racketeering Act 7), loan-sharking over a number of years (Racketeering Act 10), construction and labor racketeering (Racketeering Acts 33–35), and gambling violations lasting over a period of years (Racketeering Act 40). Gotti is alleged in the Indictment to have had "supervisory power" in the Gambino Family administration.

 With respect to Racketeering Act Seven, Gotti is alleged to have robbed by knife and gun point the same drug dealer Zollo is alleged in Racketeering Act Six to have attempted to collect by extortionate

means $21,000 in Zollo Construction Corp. funds alleged in Count Eleven to have been loaned to the dealer. Relatedness is established because Racketeering Act Seven is related to other Racketeering Acts alleged in the Indictment, *e.g.*, Racketeering Act Six charging Zollo with extortion of this same individual. Further, Racketeering Act Six is sufficiently related to the means and methods of the enterprise. In essence, Gotti and Zollo's control of, and connection to, Zollo Construction Corp., and the loan to the drug dealer provide the relatedness for this predicate.

Racketeering Acts 38 and 39 charge Zollo with mail fraud relating to prevailing wage violations by Zollo Construction Corp. on two of its construction projects. Gotti and Zollo are both charged in Racketeering Act 37 with concealing Gotti's presence on a construction project and failing to pay him the prevailing wage. Since Gotti's involvement also connects Zollo's conduct to the other Racketeering Acts charged in the Indictment and Zollo is alleged to be an "associate" of the Gambino Family, and in this role to have "perpetuated fraudulent schemes to further the Gambino Family's interest in the construction industry and committed extortion," the necessary relatedness is established. The Government contends that it is the defendants' membership in the enterprise that enabled them to commit the predicate offenses which are related and continuous.

■■■■ The second prong of the *H.J. Inc.* test requires that the racketeering predicates amount to, or pose a threat of, continued criminal activity. The concept of continuity is both closed and open-ended, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893. The Government may show closed-ended continuity by proving a series of related predicate acts extending over a substantial period of time. *See id.* at 242, 109 S.Ct. 2893. Predicate acts which extend only over a few weeks or

months, and do not threaten future criminal conduct, do not satisfy this continuity requirement. *See id.* The requisite continuity is present, however, if the Government establishes that the predicates pose a threat of continued criminal activity. *Id.* at 242–43, 109 S.Ct. 2893. Further, where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continuity. *Minicone*, 960 F.2d at 1106 (citing *Indelicato*, 865 F.2d at 1383).

■■■■ Here, open-ended continuity is established since the predicate acts or offenses are part of the alleged enterprise's regular way of doing business, i.e. the Gambino Family's method of allegedly earning money through crimes such as extortion, loansharking and gambling. *See H.J. Inc.*, 492 U.S. at 242–243, 109 S.Ct. 2893 ("the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.").

Applying the standards outlined above, the Court finds the Racketeering Acts challenged by Gotti and Zollo meet RICO's requirements of relatedness and continuity. Their motion to dismiss on this ground is denied.

## XI. *SEVERANCE OF COUNT ELEVEN*

Gotti and Zollo move for severance of Count Twenty (hereinafter referred to as Count 11 of S9) which charges Zollo with conspiring to engage in cocaine trafficking, on the grounds that: (1) it is improperly joined under Fed.R.Crim.P.Rule 8, and/or (2) it is highly prejudicial under Rule 14. For the reasons that follow, the motion is denied.

■■■■ Federal Rule of Criminal Procedure 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have partic-

ipated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P.Rule 8(b). Where multiple defendants are charged in the same Indictment, Rule 8(b) governs motions for severance. *See United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988). "Thus, multiple defendants may be charged with and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a 'series of acts or transactions constituting . . . offenses.'" *Id.*

▇ Joinder under Rule 8(b) requires that the acts in which the defendants are alleged to have participated "must be unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Attanasio,* 870 F.2d 809, 815 (2d Cir.1989) (internal quotation marks and citations omitted); *see also United States v. Reinhold,* 994 F.Supp. 194, 197 (S.D.N.Y.1998).[10]

▇ Here, joinder is proper under Rule 8(b) based on the contours of an Indictment that relates to criminal activities by members and associates of the alleged enterprise—the Gambino Family. Although Count Eleven has no parallel Racketeering Act, the conduct underlying the charge is related to the conduct underlying Racketeering Acts Six and Seven.[11] Count Eleven charges that Zollo, an alleged associate of the enterprise, conspired with others in October 1996 to violate the federal narcotics laws by using approximately $21,000 from Zollo Construction Corporation to finance the purchase by a cocaine trafficker of approximately one kilogram of cocaine. Racketeering Act Six charges that from October 1996 to May 1998, Zollo conspired with others to collect by extortionate means the $21,000 borrowed by the cocaine trafficker. Racketeering Act Seven charges Gotti with the October 1996 robbery of this same cocaine trafficker. Thus, the Indictment itself supplies the link between these offenses, as one is alleged to have stemmed from the other. *See Turoff,* 853 F.2d at 1044. Consequently, joinder under 8(b) is proper.[12]

10. The Courts of Appeals disagree over whether Rule 8(b) severance motions should be decided solely on the basis of the allegations in the Indictment or, instead, may be decided on the basis of pretrial proffers by the Government. *Compare, e.g., United States v. Marzano,* 160 F.3d 399, 401 (7th Cir.1998) ("The test set forth in [Rule 8(b) ] is whether the indictment 'alleges' that the defendants 'participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.' Notice the reference to allegation; the *test is* what the indictment charges, not what the evidence shows."); *United States v. Wadena,* 152 F.3d 831, 848 (8th Cir.1998) ("An indictment must reveal on its face a proper basis for joinder."), with *United States v. Wilson,* 26 F.3d 142, 153 (D.C.Cir.1994) ("In determining whether joinder of multiple defendants in a single prosecution is proper, this circuit permits a trial court to consult the indictment as well as any other pretrial evidence offered by the government."), *cert. denied sub nom., Briscoe v. United States,* 514 U.S. 1051, 115 S.Ct. 1430, 131 L.Ed.2d 311 (1995); *United States v. McGill,*

964 F.2d 222, 242 (3d Cir.) ("Trial judges may look beyond the face of the indictment to determine proper joinder in limited circumstances."), *cert. denied,* 506 U.S. 1023, 113 S.Ct. 664, 121 L.Ed.2d 588 (1992). While in the context of a motion for severance under Rule 8(a), our Circuit has approved a trial court's reliance in part on the Government's representation, *see United States v. Ajlouny,* 629 F.2d 830, 842 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981), it has not ruled on this issue in the context of joinder under Rule 8(b).

11. Zollo and Gotti's motions to dismiss Racketeering Acts Six and Seven have been denied. *See supra,* Point X.

12. The Government contends that although Zollo moves for severance of Count Eleven pursuant to Rule 8(b), the proper Rule for his motion is 8(a). *United States v. Biaggi,* 705 F.Supp. 852, 855–858 (S.D.N.Y.1988); *but see United States v. Ashley,* 905 F.Supp. 1146, 1164 n. 17 (E.D.N.Y.1995). Rule 8(a), which is a less stringent test than 8(b), provides that

Even where joinder is proper under Rule 8(b), a Court may, in its discretion, grant a severance under Rule 14 to prevent undue prejudice to a defendant. Under Rule 14, in view of the preference in the federal system for the joint trial of defendants indicted together, a defendant bears a heavy burden of showing that joinder will result in substantial prejudice. *See United States v. Amato*, 15 F.3d 230, 237 (2d Cir.1994); *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Where joinder under Rule 8 is proper, severance is warranted only "if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933.

Here, Gotti and Zollo have not made such a showing. Gotti claims that a narcotics charge will "inflame the passions of a jury," and Zollo is concerned that the jury might convict him of more serious charges solely because of the evidence of drug dealing. This concern is important but certainly does not present circumstances particularly unusual in criminal proceedings. While the Court is sensitive to it, it does not provide a basis for severance under Rule 14 and can be handled by appropriate limiting instructions.

The fact that the defendants could have varying degrees of exposure or might be confronted with varying amounts of evidence does not require separate trials. *See United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993); *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir.1991) ("[D]isparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance."). Moreover, the Government represents that

significant portions of proof of Count Eleven will be included in the proof of Racketeering Acts Six and Seven. *See United States v. Romero*, 54 F.3d 56, 60 (2d Cir. 1995) (no substantial prejudice in joinder of counts where same evidence would be admissible in both trials if there had been severance); *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993) ("Evidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994).

Again, to the extent some of the Government's evidence will not apply to one or more of the defendants, the Court will certainly entertain appropriate limiting jury instructions. *See Zafiro*, 506 U.S. at 539, 113 S.Ct. 933 ("less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."). Since neither Gotti nor Zollo has shown that a joint trial will compromise specific trial rights, nor, given the contours of the charges against them, demonstrated that a jury would be unable to render reliable decisions about guilt or innocence, they have not met the heavy burden required to justify a Rule 14 severance. The motion is denied.

## XII. *SUPPRESSION OF PEN REGISTERS BECAUSE OF AUDIO CAPABILITY*

Defendant Zambouros moves for suppression of the fruits of pen registers employed under the authority of orders issued by state justices pursuant to New York State's pen register statute. The basis for this motion is Zambouros' attorney's belief that pen registers that could be used as wiretaps were employed during this investigation. This motion is prem-

---

joinder of offenses against a single defendant is proper when they are: (1) based on the same act or transaction, or (2) based on two or more acts or transactions connected together or constituting parts of a common plan

or scheme, or (3) of the same or similar character. *Turoff*, 853 F.2d at 1042. Based on the above discussion, joinder of Count Eleven is proper based on either Rule 8(a) or 8(b).

ised on *People v. Bialostok,* 80 N.Y.2d 738, 594 N.Y.S.2d 701, 610 N.E.2d 374 (1993), in which the New York Court of Appeals ruled that evidence must be suppressed if obtained through the use of pen registers that are capable of being converted into audio devices even where there is no evidence that the pen register devices actually were converted or that any conversations were overheard.

> Zambouros' attorney states:
>
> It is believed that during the course of its investigation, agents employed a pen register device which was capable of use as a wiretap. . . . Your deponent has often been informed that New York State law enforcement uses pen register equipment that is in fact the equivalent of a wiretap device.

Zambouros has not established his standing to challenge the pen registers, nor does he delineate which pen registers he contends had the audio capability. In any event, his motion fails for another reason.

The Government contends that federal law, not state law, controls the admissibility of the pen registers, while Zambouros contends state law is applicable. Resolution of this particular issue is not necessary because the pen registers at issue met state law requirements.[13] The Government has submitted the Affidavit of OCTF Special Investigator Terrence Williams dated January 7, 1999 which es-

tablishes that the pen registers in this case did not have the potential for simple conversion to eavesdropping devices. Further, the Affidavit submitted for the pen register of December 12, 1995 stated that the devices to be used to execute the order would not have audio capacity. Zambouros' motion is denied.

## XIII. *DISMISSAL OF RACKETEERING ACTS BECAUSE OF DUPLICITY*

█ Zambouros alleges that because Racketeering Acts 10 and 11, and Count 23 (now Racketeering Acts 8 and 9, and Count 13 of S9) refer to fraud involving six specified calling cards, they are duplicitous and do not sufficiently advise him of the nature of the wrongful conduct alleged. He claims that because some of the cards were created before he is alleged to have joined the enterprise, a jury might predicate his guilt on cards with which he was not involved. Consequently, he asserts the Government must select the phone card for which it intends to present proof against him at trial. For the reasons that follow, Zambouros' motion is denied.

A count is duplicitous if it joins two or more distinct crimes in a single count. *United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992). Our Circuit has recognized that " '[i]f the doctrine of duplicity is to be more than an exercise in mere for-

---

**13.** The Court notes that federal law generally governs the admissibility of evidence in a federal prosecution, *see supra* footnote 1, and as such Title III does not require law enforcement officials to obtain authorization for the installation of pen registers. *See Smith v. Maryland,* 442 U.S. 735, 739–746, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *United States v. Miller,* 116 F.3d 641, 660–661 (2d Cir.1997) (in considering *Bialostok* the Court stated that the rule originally enunciated in *Smith v. Maryland* that because pen registers do not intercept the contents of communications but merely record dialed numbers, they need not comport with the requirements of Title III, applied also to models that have not been altered so as to enable audio interception. The Court also stated that Title III "guards against actual infringements of privacy, not

purely hypothetical ones."); *see also United States v. Veksler,* 62 F.3d 544, 549 (3d Cir. 1995) ("mere suggestion that pen register equipment is now capable of misuse does not give us a basis to depart from the controlling precedent of [*Smith v. Maryland* ]"), *cert. denied,* 516 U.S. 1075, 116 S.Ct. 780, 133 L.Ed.2d 731 (1996); *United States v. Love,* 859 F.Supp. 725, 732–733 (S.D.N.Y.1994) (expressly rejecting *Bialostok* and stating that in the absence of evidence that pen register devices were in fact used to intercept communications prior to authorization, pen register evidence will not be suppressed), *aff'd sub nom, United States v. Roberts,* 41 F.3d 1501 (2d Cir.1994), *aff'd,* 100 F.3d 942, 1996 WL 20513 (2d Cir.), *cert. denied,* 519 U.S. 951, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996).

malism, it must be invoked only when an indictment affects the policy considerations'" that underlie the doctrine. *United States v. Margiotta*, 646 F.2d 729, 732–733 (2d Cir.1981) (citation omitted). These policy considerations include:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

*Id.* at 733 (citation omitted).

█ Our Circuit has declined to hold that any acts capable of being charged as separate offenses must be alleged in separate counts. *Aracri*, 968 F.2d at 1518 (citing *Margiotta*, 646 F.2d at 733). Acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme. *Id; Margiotta*, 646 F.2d at 733 (allowing indictment charging mail fraud to include numerous mailings in a single count when the essence of the alleged wrong is the single scheme to defraud); *United States v. Girard*, 601 F.2d 69, 72 (2d Cir.1979) (four sales of four sets of documents were part of a continuing scheme).

The Government represents that it has apprised Zambouros' counsel that it is the Government's position that all of the personal identification numbers relating to the pre-paid cards were unauthorized and obtained with an intent to defraud. Thus, Zambouros is on notice that misconduct is alleged as to all of the cards. Further, the Government represents that it will argue that, as a legal matter, Zambouros is responsible for the misconduct with respect to the pre-paid calling cards charged under the RICO conspiracy and access fraud conspiracy, regardless of when he joined

the scheme. Consequently, the contested counts are proper. The motion is denied.

## XIV. ORDER STRIKING PREJUDICIAL SURPLUSAGE FROM THE INDICTMENT

Gotti moves pursuant to Fed.R.Crim.P.Rule 7(d), to strike certain sections of the Indictment as prejudicial surplusage. For the reasons that follow, the motion is granted in part and denied in part.

Specifically, Gotti moves to strike paragraphs two and six of the Indictment which generally describe the history, purpose and structure of the Gambino Family. Gotti also moves to strike the words "brutal retribution" contained in paragraph two. Read in its entirety the sentence states, "The Family also promised brutal retribution against those who provided information about its activities to law enforcement, and even those suspected of doing so." Gotti also moves to strike the words "possessed deadly weapons and threatened and conspired to murder" in paragraph 10(a).

█ Because the standard for surplusage is exacting, only rarely is alleged surplusage stricken from an indictment. *United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y.1982) (citing 1 Charles A. Wright, Federal Practice and Procedure § 127, at 278 n. 15 (1969)). "A motion to strike surplusage is granted only where it is clear that the allegations are not relevant to the crime and are inflammatory or otherwise prejudicial." *United States v. Louie*, 625 F.Supp. 1327, 1341 (S.D.N.Y. 1985) (citing *Napolitano*, 552 F.Supp. at 480), *appeal dismissed sub nom., United States v. Tom*, 787 F.2d 65 (2d Cir.1986). If the evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken. *United States v. Elson*, 968 F.Supp. 900, 909 (S.D.N.Y.1997) (citing *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990)).

■ Paragraphs two and six are directly relevant to the RICO charges against Gotti and the other defendants since they explain the nature and structure of the enterprise. The Indictment alleges that the defendants are members of an "enterprise" as defined by 18 U.S.C. § 1961(4). This enterprise the Government alleges is the "Gambino Family" associated with *La Cosa Nostra.* The Government is entitled to prove that the "Gambino Family" exists, and that the defendants are associated with it. *See Napolitano,* 552 F.Supp. at 480 (denying defendants motion to strike "Boss," "Crews," and "Capodecino" because clarify the structure of the enterprise); *Louie,* 625 F.Supp. at 1341 ("The indictment's description and categorization of the defendants as leaders, senior associates and junior associates are entirely relevant and perhaps even essential to the RICO counts for the purpose of demonstrating an enterprise. The structure of the enterprise and the role of each person are often the most relevant evidence of the "continuing unit" which constitutes a RICO enterprise."). Accordingly, defendant's motion to strike paragraphs 2 and 6 is denied.

■ The Government claims that it will present evidence at trial that one of the ways the enterprise maintained power was by meting out "brutal retribution" against informants or threatening to do so. Additionally, the Government claims that it is entitled to prove the means and methods of the enterprise regardless of whether those means and methods have been used in a particular racketeering act. The means and methods section of the Indictment alleges that the members of the enterprise "possessed deadly weapons and threatened and conspired to murder." The language regarding the possession of deadly weapons is directly relevant to Racketeering Act Seven which charges Gotti with a robbery at gun point. The "conspired to murder" clause, however, is no longer directly related to the Indictment due to pleas by former co-defendants. Because the "conspired to murder" language is prejudicial and inflammatory, the motion to strike it is granted, but not as to other language in the Indictment.

## XV. *BILL OF PARTICULARS*

Pursuant to Fed.R.Crim.P.Rule 7(f), defendants Gotti and Zambouros move for a Bill of Particulars.

> Rule 7(f) ... permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.... Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required.

*United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987).

■ Whether to grant a bill of particulars rests within the sound discretion of the district court. *Id.* Our Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882, (1974) (citing *United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir.1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463, (1969)). Thus, a "bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres,* 901 F.2d, 205, 234 (2d Cir.) (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)).

■ A bill of particulars is not meant to be a tool to compel disclosure of

the Government's case before trial. *See United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974); *United States v. Nova–Nunez*, No. 96 Cr. 0599, 1997 WL 30965, at *4 (S.D.N.Y. Jan.24, 1997). The Government will not be compelled through this device to preview its evidence or legal theory. *United States v. Facciolo*, 753 F.Supp. 449, 451 (S.D.N.Y.1990). Further, the Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed. *Nova–Nunez*, 1997 WL 30965, at *4 (citations omitted). Thus, the precise manner in which the crimes charged in the Indictment are alleged to have been committed, and the exact time, place and persons present at each overt act named in the Indictment need not be revealed. *See United States v. Biaggi*, 675 F.Supp. 790, 809 (S.D.N.Y.1987); *see also United States v. Muyet*, 945 F.Supp. 586, 599 (S.D.N.Y. 1996) ("The defendants are not entitled to the 'whens,' 'wheres,' and 'with whoms' regarding the . . . conspiracy.").

In evaluating a request for a bill of particulars, "[t]he important question is whether the information sought is necessary, not whether it is helpful." *Facciolo*, 753 F.Supp. at 451. The Government has provided the defendants with a Bill of Particulars. The government has also made available extensive discovery supplementing the other information provided. (Gov.Mem. of Law 239–241). For example, it has supplied the names of the extortion victims and a list of debtors referred to in the loansharking charges. Also, the Government has supplied to Gotti the name of the alleged robbery victim. (Gov.Mem. of Law 239). All of this information apprises the defendants of the charges against them with sufficient precision to enable them to prepare a defense and avoid unfair surprise at trial. Accordingly, the defendants have not demonstrated that the broad body of additional particulars still sought remains "necessary" as the case law defines the terms. The request for a bill of particulars is denied with leave to renew in respect of specific requests.

## XVI. DEFENDANT LOIACONO'S MOTION FOR SUPPRESSION OF EVIDENCE SEIZED IN THE EXECUTION OF A SEARCH WARRANT OF HIS PERSON

Dominick Loiacono seeks suppression of evidence seized from his person on September 13, 1995 pursuant to a search warrant. Loiacono contends that the affidavit in support of the search warrant provided no basis for concluding that on that date, he would be in possession of proceeds from usurious transactions or documents reflecting them.

On September 13, 1995, upon an application by OCTF Special Investigator David Iosilevich, Justice Vincent F. Naro, New York State Supreme Court, Queens County, issued the search warrant that Loiacono challenges. That warrant authorized the search of the defendant's person and the seizure of certain items allegedly evidencing usury.

The warrant application included two affidavits. The first, signed by Justice Naro on August 16, 1995, sought warrants for other locations associated with the alleged loansharking conspiracy then under investigation. Included in that affidavit were descriptions of the background and targets of the investigation, and summaries and draft transcripts of approximately fifteen intercepted conversations during which loansharking transactions were discussed. Five conversations that allegedly indicated Loiacono's participation in the loansharking conspiracy were included in the warrant application.

The second affidavit submitted to Justice Naro incorporated the allegations contained in the prior affidavit, described the fruits of searches executed pursuant to the August 16, 1995 warrant, and set forth two additional conversations between Loiacono and Gregory DePalma in which a delivery of "meat" was discussed. The affiant

characterized those conversations as pertaining to loansharking transactions, noting that the conspirators allegedly often used coded references to "meat" to refer to usurious loans. On the basis of the two affidavits, Justice Naro issued the search warrant in question.

As previously noted, a neutral and detached magistrate's finding of probable cause is entitled to substantial deference. *See, e.g., United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). In addition, probable cause must be evaluated based on the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, *reh'g denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983).

With respect to the September 13, 1995 search warrant, this Court finds that when the totality of circumstances are considered, it was amply supported by probable cause. While Loiacono argues that the conversations offered by the government to show his participation in the alleged loansharking conspiracy were simply conversations about meat, the warrant affidavit explained that the investigators had learned that Loiacono and DePalma relied on code words related to meat when discussing their criminal usury operations.

Moreover, the two supporting affidavits sufficiently detailed the alleged loansharking conspiracy and adequately connected Loiacono to that conspiracy. In addition, the September 12, 1995 affidavit included evidence of conversations that had occurred that day, and allegedly evidenced the collection of illegal debts. Taken in their totality, the September 13, 1995 warrant was amply supported by probable cause. In any event the officers executing the warrant reasonably were entitled to rely on it. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Accordingly, Loiacono's motion to suppress the evidence seized from his person is denied.

**14.** All references to "Indictment" are to S9.

## CONCLUSION

To recapitulate, the following motions are denied:[14] (1) suppression of the fruits of wiretaps based on lack of probable cause, (2) suppression of the wiretap evidence based on the lack of appropriate efforts to minimize or amend, (3) suppression of the fruits of the February 3, 1997 search at 106–13 101st Avenue, Queens, New York, (4) suppression of the fruits of the February 3, 1997 search at 97–11 Sutphin Boulevard, (5) suppression of the fruits of the October 7, 1997 search at 97–11 Sutphin Boulevard, (6) suppression of the fruits of search and wiretap applications incorporating the December 12, 1995 and December 20, 1995 pen and wiretap applications identifying Gotti as a member, captain or boss of the Gambino Family, (7) suppression of the Marion prison tapes, (8) suppression of the fruits of the February 2, 1997, February 4, 1997, and October 7, 1997 searches based on Rule 41(a), (9) dismissal of Racketeering Acts 6, 7, 38 and 39, (10) severance of Count 11 under Rules 8(a), 8(b) and 14, (11) suppression of the fruits of the pen registers based on audio capability, (12) dismissal of Racketeering Acts 8 and 9, and Count 13 based on duplicity, (13) striking paragraphs 2, 6 and "possessed deadly weapons" of paragraph 10(a) of the Indictment, (14) suppression of the fruits of the September 13, 1995 search of Loiacono, and (15) request for a bill of particulars. The motion to strike "conspired to murder" in paragraph 10(a) of the Indictment is granted. Additionally, the Court finds that the eavesdropping warrants were issued by judicial officers of competent jurisdiction.